# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 47497

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, June 2021 Term |
| | ) | |
| v. | ) | Opinion filed: July 21, 2021 |
| | ) | |
| TIMOTHY MICHAEL DACEY, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendant-Appellant. | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Gerald F. Schroeder, Senior District Judge. Michael J. Oths, Magistrate Judge.

The decision of the district court is reversed and remanded.

Ada County Public Defender's Office, Boise, for Appellant. Sarah Tompkins argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Respondent. Mark Olson argued.

_____

MOELLER, Justice.

An Ada County jury found Timothy Dacey ("Dacey") guilty of Driving Under the Influence ("DUI"), and Dacey received a second offense sentencing enhancement. During his trial, the magistrate judge allowed Officer Jessica Raddatz ("Raddatz"), a trained drug recognition expert, to testify as a lay witness about the physical indicators that a person is on the "downside" from methamphetamine use. On intermediate appeal, the district court affirmed. Dacey argues the district court erred in affirming his conviction and sentence because (1) the "downside" testimony qualified as expert witness testimony, which should have been disclosed in discovery, and (2) the magistrate court failed to conduct the appropriate analysis to determine whether this alleged expert witness testimony was admissible. Dacey also asserts that the district court on intermediate appeal applied the wrong legal standard in determining that any error was harmless. For the reasons stated below, we reverse the decision of the district court and remand

1

with direction to vacate Dacey's judgment of conviction. We also announce that henceforth, testimony from a drug recognition expert requires the State to comply with the expert witness disclosure requirements set forth in Idaho Criminal Rule 16(b)(7).

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Boise Police Officer Michelle DeGrange ("DeGrange") responded to an early morning call for a welfare check on a man slumped over in a parked truck with the lights on and the engine running. Dacey was asleep behind the wheel. When DeGrange awoke him, she reported, Dacey's pupils were dilated and he "spoke slowly and kind of with a thick tongue." Dacey told the officer he owns a tiling business and was waiting for a job, although he could not say exactly where the job site was. DeGrange then administered a series of field sobriety tests. Dacey passed the horizontal gaze nystagmus (scoring two out of six decision points), but he failed the walk-and-turn (scoring seven out of eight decision points) and one-leg-stand (scoring three out of four decision points). DeGrange arrested Dacey on suspicion of DUI. However, a subsequent breath test indicated there was no alcohol in Dacey's blood. As a result, DeGrange requested that Officer Raddatz, a certified drug recognition expert, meet them at the Ada County Jail to perform additional tests.

Raddatz defined her role as a drug recognition expert as "an officer who receives specialized training in recognizing types of drug, drug categories, and the impairment they may or may not cause with an individual, and if that individual would be able to operate a motor vehicle safely on the roadway or not." Unlike field sobriety testing, the drug recognition evaluation ("DRE") does not result in a specific score for the tests performed, nor in a binary pass or fail outcome. Instead, the drug recognition expert assesses the "totality of the circumstances" based on the test performance and physiological indicators in order to determine whether the driver is impaired and which drugs he or she may have taken.

Raddatz conducted the DRE of Dacey in the sally port of the Ada County Jail, a noisy and chaotic space where state prisoners were being transferred as Dacey struggled through several of the tests: the walk-and-turn, one-leg-stand, modified Romberg, and finger-to-nose. During the physical examination, Raddatz observed abnormal physiological signs she testified are often associated with impairment—Dacey's eyes showed a lack of convergence, his pupils failed to rebound to a normal size after dilation, he had a rigid muscle tone, and there was a pink

2

substance around his nostrils and mouth when viewed under a UV light. However, she also testified that Dacey's blood pressure and pulse were normal, his pupils dilated normally under different lighting conditions, and his eyes showed no nystagmus. When questioned, Dacey admitted he had snorted methamphetamine "like six days ago." Raddatz concluded that Dacey was impaired, either because of a central nervous system stimulant, "the downside of that," or a narcotic analgesic. Although a later blood test showed that Dacey had methamphetamine and amphetamines in his system, it could not confirm whether Dacey was impaired at the time of testing. Dacey was charged with DUI and a sentencing enhancement because this was his second DUI in ten years.

## B. Procedural Background

Prior to trial, Dacey requested the State disclose any expert testimony, including "[a] written summary or report of any testimony that the State intends to introduce pursuant to rule 702, 703, or 705 of the Idaho Rules of Evidence at trial or hearing; including the witness' opinions, the facts and data for those opinions, and the witnesses [sic] qualifications." *See* I.C.R. 16(b)(7). The State's discovery response listed one potential expert witness—the toxicologist who evaluated Dacey's blood sample. The State did not disclose Raddatz as an expert witness; however, she was listed as a lay witness.

On the morning of trial, Dacey learned that the State intended to have Raddatz testify, in part, about the physiological indicators that a person is on the "downside" of a methamphetamine high. Dacey notified the trial court about his concerns that Raddatz had not been disclosed as an expert witness because the indicators Raddatz intended to testify about were not included in the DRE handbook.[1] As a result, the defense argued that the basis for Raddatz's knowledge regarding the "downside" of intoxication was not part of her normal training and had not been established. Dacey requested that he be able to voir dire Raddatz outside the presence of the jury in aid of his objection. The trial court denied his request. Dacey continued to express concern before the magistrate court that Raddatz's testimony would not actually center on information from the DRE handbook—which he agreed would not require expert disclosure—but would instead center on her expert opinion that a person *not exhibiting* the typical signs of intoxication as described in the handbook could still be on the "downside" of methamphetamine intoxication.

---

[1] Additionally, the district court found that "[p]rior to the presentation of evidence the defendant objected to Officer Raddatz testifying about how methamphetamine affects people without having produced a curricula vitae and qualifying her to give an opinion on the subject."

3

The magistrate court, however, determined that Raddatz's testimony would be based on her personal observations, rather than expert knowledge. The magistrate court concluded that any observations Raddatz made that were contrary to the DRE handbook could be dealt with on cross-examination. Dacey continued to assert that testimony as to the signs of methamphetamine withdrawal and associated intoxication required expert disclosure. However, the magistrate court disagreed:

> I don't think it takes an expert to say that a stimulant means that someone is stimulated, and that after a person is stimulated they reach a point of stimulation that starts to recede, and at some point they go the other direction, and I have seen lots of people over time that use drugs and they tend to — you know, to spike in terms of energy levels so forth and to get lethargic and towards the downside . . . I don't think that requires a toxicologist. I think that's logical. And I think you can cross-examine on it.

At trial, Raddatz testified about the DRE she performed on Dacey, as well as her special training and certification as a "drug recognition *evaluator*"—the State had volunteered to avoid using the word "*expert*" when presenting Raddatz to the jury.[2] During her testimony, Raddatz opined "that Mr. Dacey was either under the influence of a central nervous system stimulant, the downside of that, you know, kind of coming down on it. Or a narcotic analgesic." She also explained downside means "[i]t's basically your body's physical reactions to a particular substance, leaving your body or if you're jonesing for it, I guess. It depends on the drug and the person." When asked why Dacey's blood pressure, heart rate, and body temperature did not comport with someone under the influence of methamphetamine, Raddatz explained that his physiological traits "would be consistent with someone who is experiencing the downside of a central nervous stimulant." The magistrate court overruled Dacey's objection to the testimony. Raddatz testified that her opinion was "based on everything I saw, the totality of what I saw at that time."

On cross-examination, counsel for Dacey questioned Raddatz about her training and the portions of the DRE performed on Dacey that did not indicate methamphetamine impairment according to the DRE manual and matrix. Again, Raddatz reiterated that her conclusions were not the result of numerical test scores she "plugged" into the matrix; rather, they were based on the totality of all the tests and her observations.

---

[2] The magistrate court later *sua sponte* advised the jury as follows: "And just for the benefit of the jury, I think 'DRE' is short for 'drug recognition evaluator,' just we use jargon around here."

4

On redirect, Raddatz testified that she had received specific training on the downside effects of certain drugs, including methamphetamine, and that she had supplemented this knowledge on a regular basis with annual trainings, personal study of peer reviewed articles, and her own self-directed research. Raddatz also said that the anomalous results in Dacey's case were consistent with someone experiencing the "downside" of methamphetamine use rather than the "upside," which the DRE matrix was designed to diagnose. Again, counsel for Dacey objected, and the magistrate court overruled the objection, allowing Raddatz to clarify that certain physiological characteristics would be different when a person was experiencing "downside" effects from methamphetamine. Specifically, Raddatz testified that the pupils would be returning to "homeostasis," so rather than appearing dilated, a pupil might appear normal or constricted, and pupil reaction to light would be normal or slow. Moreover, she testified that pulse rate, body temperature, and blood pressure—which might be elevated with the "upside" of methamphetamine intoxication—could all appear low during the "downside."

During closing arguments, the State relied heavily on Raddatz's testimony. For example, the prosecuting attorney told the jury that drugs affect bodies differently, averring "that's why the experience of Officer Raddatz and her experience and her education come into play and are so valuable." The State noted that the jury had seen video of Dacey struggling to perform some of the tests in the DRE and attributed his performance to "downside" impairment, stating generally that "what goes up must come down." For support, the State pointed to Raddatz's testimony that several of Dacey's seemingly normal physiological signs—normal pupil size, blood pressure, body temperature, and pulse—could actually reflect a body "trying to come back to what the normal body mode is." Finally, the State concluded that it was "absolutely, absolutely [] convinced and satisfied" with Raddatz's opinion that what she was seeing was due to "a downside influence of the methamphetamine that was found in [Dacey's] system."

Dacey appealed to the district court, arguing the trial court erred both in refusing to allow him to voir dire Raddatz in aid of his objection and in overruling his objection to Raddatz's testimony without engaging in a proper analysis of whether she was an expert. On intermediate appeal, the district court concluded that the magistrate court had not erred in allowing Raddatz to testify as a lay witness nor in denying Dacey's request to voir dire in aid of objection. The district court noted that Raddatz had been thoroughly and effectively cross-examined and that the jury was given sufficient reasons to accept or reject her opinion. Finally, the district court

5

determined that even if the magistrate court had erred, the error was harmless because other evidence proved Dacey's guilt beyond a reasonable doubt. Dacey timely appealed.

## II. STANDARD OF REVIEW

When reviewing the decision of a district court sitting in its intermediate appellate capacity:

> The Supreme Court reviews the trial court (magistrate) record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings. If those findings are so supported and the conclusions follow therefrom and if the district court affirmed the magistrate's decision, we affirm the district court's decision as a matter of procedure.
>
> *Bailey v. Bailey*, 153 Idaho 526, 529, 284 P.3d 970, 973 (2012) (quoting *Losser v. Bradstreet*, 145 Idaho 670, 672, 183 P.3d 758, 760 (2008)). Thus, this Court does not review the decision of the magistrate court. *Id*. "Rather, we are 'procedurally bound to affirm or reverse the decisions of the district court.' " *Id*. (quoting *State v. Korn*, 148 Idaho 413, 415 n. 1, 234 [224] P.3d 480, 482 n. 1[ ](2009)).

*Pelayo v. Pelayo*, 154 Idaho 855, 858–59, 303 P.3d 214, 217–18 (2013). Here, inasmuch as the district court affirmed the magistrate court's decision below, this Court must focus on the findings of fact and conclusions of law made in the magistrate court proceeding and determine whether they were (1) supported by the evidence in the record and (2) consistent with the law. If not, we must reverse the district court.

## III. ANALYSIS

**A. The district court erred in affirming the magistrate court's decision to allow Officer Raddatz to testify as a lay witness about the "downside" effects of methamphetamine use.**

Dacey argues that the district court erred in affirming the admission of Officer Raddatz's testimony as to the "downside" effects of methamphetamine for two primary reasons. First, the State failed to disclose Officer Raddatz as an expert witness under Idaho Criminal Rule 16(b)(7). Second, the magistrate court denied Dacey's motion to voir dire Officer Raddatz in aid of his objection concerning the admissibility and scope of Raddatz's "downside" testimony. Dacey contends this specific testimony was outside the scope of the standard DRE procedures described in the DRE handbook and, therefore, required that the State submit Raddatz as an expert witness. Dacey also argues that the magistrate failed to conduct the correct analysis to determine whether

6

Raddatz's testimony met the requirements for expert testimony under Idaho Rule of Evidence 702.

The errors asserted here all center on whether Dacey's objections made prior to the commencement of the trial and during the trial to allowing Raddatz to testify as a lay witness had merit. On appeal, a trial court's evidentiary rulings are reviewed under an abuse of discretion standard:

> "Error is disregarded unless the ruling is a manifest abuse of the trial court's discretion and affects a substantial right of the party." *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 51, 995 P.2d 816, 821 (2000). "The decision to admit opinion testimony, whether lay opinion or expert opinion, rests within the discretion of the lower court, while the determination of its weight lies with the jury." *State v. Almaraz*, 154 Idaho 584, 602, 301 P.3d 242, 260 (2013) (quoting *State v. Cutler*, 94 Idaho 295, 299, 486 P.2d 1008, 1013 (1971)). "The trial court's broad discretion in admitting evidence 'will only be disturbed on appeal when there has been a clear abuse of discretion.' " *Id.* (quoting *State v. Merwin*, 131 Idaho 642, 646, 962 P.2d 1026, 1030 (1998)).

*State v. Hall*, 163 Idaho 744, 773, 419 P.3d 1042, 1071 (2018). When this Court reviews the record for an alleged abuse of discretion, we must determine whether the trial court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

The magistrate court characterized the testimony he expected Raddatz to give as that of a passive evaluator—one who merely "plugged" information into a matrix which "spit out" a result. However, Dacey contends that Raddatz's conclusion about Dacey's impairment was based on the application of her specialized training, knowledge, and experience—the very definition of an expert under the Idaho Rules of Evidence. Idaho Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

I.R.E. 702. The magistrate court ultimately allowed the testimony, but did not admit it under Rule 702; rather, it relied on Rule 701 of the Idaho Rules of Evidence, which defines lay witness testimony as follows:

If a witness is not testifying as an expert, testimony in the form of an opinion or inference is limited to one that is:

(a)  rationally based on the witness's perception;

(b)  helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c)  not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

I.R.E. 701.

Idaho Criminal Rule 16(b)(7) requires the State to provide, upon written request of the defendant, "a written summary or report of any testimony that the state intends to introduce at trial" that qualifies as expert witness testimony under Rules 702, 703, or 705 of the Idaho Rules of Evidence. The disclosure must include a summary of "the witness's opinions, the facts and data for those opinions, and the witness's qualifications . . . ." I.C.R. 16(b)(7). Prior to trial, Dacey requested that the prosecutor disclose such evidence; yet, the State did not provide a summary or report of Raddatz's intended testimony. Further, the magistrate court did not permit Dacey to voir dire Raddatz prior to testifying in order to ascertain the nature and scope of her anticipated testimony. The question before this Court, then, is whether Raddatz was an expert witness whom the State failed to disclose.

Previously, this Court and the Idaho Court of Appeals have allowed officers to testify as lay witnesses where an officer explains an investigative process but does not offer a personal opinion. For example, in *State v. Hall*, this Court held that the trial court did not abuse its discretion in admitting lay witness testimony from an officer who had performed a DNA swab on another suspect in the case and, based on the lab results of the swab, eliminated that suspect. *Hall*, 163 Idaho at 771-74, 419 P.3d at 1069-72. In concluding that the officer was a lay witness, this Court emphasized that the officer was not testifying as to his personal opinion. *Id.* at 773, 419 P.3d at 1071. Instead, this Court observed that the officer "was providing background information crucial to understanding the investigative process." *Id.* Specifically, the officer described that he investigated the suspect's alibi, collected his DNA, and as a result, turned his attention to other suspects. *Id.* This Court found that none of this exceeded the boundaries of lay witness testimony—i.e., inferences based on the officer's rational perception.

Likewise, in *State v. Youmans*, the Court of Appeals found that the trial court did not abuse its discretion in allowing an officer's lay witness testimony that he had used an online

database in order to identify pills discovered in Youmans' purse as hydrocodone. *State v. Youmans*, 161 Idaho 4, 7–8, 383 P.3d 142, 145–46 (Ct. App. 2016). In his testimony, the officer described how he had entered the pill's characteristics, such as its shape, color, and imprinted numbers, into an online database—although he could not recall the database name—which returned names of substances that corresponded with that information. *Id.* The officer stated that using this type of internet database to identify pills "was something he knew based on his training and experience as a law enforcement officer, and that it was common for other officers to use online resources." *Id.* The Court of Appeals agreed with the trial court that the officer was a lay witness. *Id.* at 8, 383 P.3d at 146. The officer described the steps he took in order to identify the pills, consistent with the practice of other officers. *Id.* Further, the Court of Appeals observed that using such an online database did not require any scientific, technical, or specialized knowledge. *Id.* He simply entered his observations and the database returned a result. The Court of Appeals found that the officer's testimony was generally analogous to a lay witness identifying a party from a photograph, *see State v. Barnes*, 147 Idaho 587, 590–96, 212 P.3d 1017, 1020–26 (Ct. App. 2009), or comparing signatures, *see State v. Waller*, 140 Idaho 764, 767, 101 P.3d 708, 711 (Ct. App. 2004). *Id.*

By contrast, *State v. Morin* was a DUI case in which the Court of Appeals found that the State had not adequately responded to the defendant's request for expert witness disclosure because it had failed to state the substance of an expert witness's opinion or its basis. 158 Idaho 622, 349 P.3d 1213 (Ct. App. 2015). In answer to Morin's discovery request in that case, the State disclosed the following:

> Dr. Dawson is an expert in toxicology and pharmacology and will assist the trier of fact in understanding the evidence regarding the effects of drugs on the behavior and performance of the defendant as reported in this case. Dr. Dawson will utilize known and generally accepted scientific principles of absorption, distribution, metabolization and excretion of drugs. Testimony may include information on the effects of the drugs consumed by the defendant in this case and the possible effects of said drugs.

*Id*. at 625, 349 P.3d at 1216. At trial, Dr. Dawson testified "that dilated pupils, confusing speech patterns, impairments to balance and other psychomotor function, 'lack of convergence,' and a green coating of the tongue were all diagnostic indications of marijuana intoxication exhibited by Morin." *Id.* Dr. Dawson also testified about how the other drugs identified in Morin's blood test

might have affected him. *Id.* Finally, the State asked for Dr. Dawson's opinion regarding impairment:

> Q. And based on your observations—your review of the reports, your observations of the field sobriety tests, do you have an opinion regarding whether or not the defendant was intoxicated on February 24, 2012?
>
> A. Yes.
>
> Q. What is that opinion?
>
> A. I believe the defendant was impaired and was unsafe to operate a motor vehicle.

*Id.*

The Court of Appeals held that the State's disclosure had not complied with Idaho Criminal Rule 16(b)(7) because the discovery response was generic and had not disclosed "one fact or opinion to which [the expert] would testify"—especially the opinion that Morin was too impaired to safely operate a motor vehicle. *Id.* at 626–27, 349 P.3d at 1217–18. Nonetheless, the Court of Appeals concluded that the error had been harmless, in part, because Morin was on notice that the topic of intoxication would be covered, even if Dr. Dawson's opinion was not expressly disclosed. *Id.* at 627, 349 P.3d at 1218.

The investigatory processes described in both *Hall* and *Youmans* included inferential conclusions made by the officers. In *Hall*, the officer concluded that a suspect could be eliminated based on a negative DNA result. In *Youmans*, the officer concluded the pills in question were hydrocodone. However, the emphasis in the testimony was on (1) how the officers reached those conclusions based on technical information provided *passively* to them by an outside source, and (2) what they did next as a result of that technical information. Whether the jury had doubts about the validity of the officer's conclusions—for example, because the officer in *Youmans* could not recall the name of the database he used to enter the pill information—was a question of weight and not admissibility. Conversely, in *Morin*, the statements from the physician who was a toxicology and pharmacology expert required specific expert disclosure. In that case, the expert witness *interpreted* the results of physiological tests, opined that the results related to signs of marijuana intoxication, and then concluded that Morin was under the influence of marijuana and too intoxicated to drive.

Here, the magistrate court's determination that Raddatz could testify as a lay witness appears to be based on a misapprehension—reinforced by the State—about Raddatz's role in the

investigatory process. Without permitting Dacey to voir dire the witness, the magistrate court described what he *anticipated* would be the nature of Raddatz's testimony as follows:

> She's going to say, "I gave all of the tests and the matrix, plugged the numbers into the thing. It spit it out. My opinion, based on the – plugged it into the matrix, that the person that was testing was under the influence of a central nervous stimulant"; right?

The State agreed. The magistrate court asked if Dacey would require expert disclosure for Raddatz to testify that she "plugged" certain information into a system "and something pops out" indicating that the person is under the influence of a central nervous stimulant. Dacey clarified again that his objection was to testimony Raddatz might offer as to her own opinion, based on undisclosed specialized knowledge and training, that *normal physiological signs* could be interpreted as signs of impairment. However, the magistrate court concluded that it did not take an expert to determine someone who had been on a stimulant would experience downside effects as the drug receded, positing that this was "common sense" and, therefore, an issue of credibility that could be dealt with on cross-examination.

However, Raddatz's testimony—especially her characterization of "downside impairment"—was a far cry from a passive analysis based on common sense or merely reading the results of a computer generated report, like applying the results of a DNA test or an internet search. Instead, the State presented Raddatz's DRE as one in which Raddatz's expertise played the pivotal role. First, Raddatz defined a drug recognition *evaluator* (more commonly known in courts as a drug recognition *expert*) as "an officer who receives specialized training" in recognizing the impairment caused by certain types of drugs and how that would affect a person's ability to drive a motor vehicle—a description mirroring Rule 702's definition of an expert as one with "scientific, technical, or other specialized knowledge." *See* I.R.E. 702. She stated that the DRE itself is a series of standardized tests that examine "medically acceptable indicators"—often the purview of experts—that someone may be under the influence of drugs. Raddatz then described each of the tests Dacey performed during the DRE, explaining that she did not assign a numerical score for any of the tests because, on their own, the tests were inconclusive. Simply put, Raddatz did not rely on a testing matrix to provide an opinion about Dacey's impairment. Instead, she applied her training and knowledge to the totality of the circumstances in order to form *her own opinion*. Put in her own words, Raddatz explained, "I

11

make the call on what *I feel* this person may or may not be under the influence of." (Emphasis added).

Raddatz's conclusion about the physiological tests she performed on Dacey are even more indicative of the type of expertise governed by Rule 702. Dacey's vital signs—pulse, blood pressure, and body temperature—all presented in the low-to-normal range. She checked Dacey's pupils under three different lighting conditions, gauging their size with a pupilometer, and found them to be normal, though they did not rebound quickly from dilation. Finally, Raddatz checked Dacey for "signs of ingestion" and saw a substance that appeared pink under a UV light in his mouth and around his nostrils. Raddatz also checked Dacey's muscle tone for rigidity; she testified that people on depressants may have very loose muscles, whereas people on stimulants may have very rigid muscles, and she found Dacey's muscles to be very rigid. Under the totality of the circumstances, Raddatz reasoned that even Dacey's "normal" physiological responses were likely due to the body's attempt to return to "homeostasis" and could be viewed as signs of impairment. On redirect, Raddatz testified she was able to reach this conclusion because she had specific training on the downside effects of certain drugs, including methamphetamine, and that she had supplemented this knowledge on a regular basis with annual trainings, study of peer reviewed articles, and her own self-directed research and study.

To qualify as a lay witness under Rule 701, the testimony must be based on the witness's rational perception. The magistrate court may have anticipated that Raddatz's testimony would resemble the lay testimony given by the officers in *Hall* and *Youmans*, which described investigations in which the officers passively received information and, on that basis, decided what to do next. But Raddatz's role was altogether different. Raddatz's own description of the basis for her testimony could hardly have been a more spot-on example of the definition of expert witness testimony under Rule 702. For example, Raddatz testified that she did not "plug" information into a matrix; rather, she examined the information and reached *her own* conclusions. Nor can we characterize those conclusions as based on mere rational perception, as Rule 701 requires—or even "common sense," as the magistrate court asserted—because the entire point of the State's reliance on Raddatz's "downside" testimony was that even a normal physiological sign that does not typically connote impairment can, when interpreted by an expert in the field, actually signal the opposite. This exposes the fatal flaw in the reasoning of the State and the lower courts. If the evidence of impairment in this case was counter-intuitive based on

12

the ordinary implications of such evidence, then how could Raddatz's conclusions have been solely based on rational perception or common sense? Clearly, expertise beyond that of a lay person would be required to reach the non-intuitive, scientific conclusion that Dacey was still legally impaired even though his vital signs (blood pressure, heart rate, and body temperature) were normal.

We note briefly that both California cases cited by the district court in affirming the magistrate court's determination that the downside testimony was admissible as lay witness testimony are distinguishable from the present facts. First, *People v. Simi*, 2011 WL 3715544 (Cal. Ct. App. 2011), allowed descriptive lay testimony that a person coming down from a methamphetamine high was "lethargic and relaxed"; however, that case did not center on the kind of specific, medical indicia of intoxication implicated here, nor on vital signs that were inconsistent with impairment. Likewise, in *People v. Dominguez*, 2003 WL 22962502 (Cal. Ct. App. 2003), the downside testimony by the lay witness—which did not require expert witness disclosure because it was raised in the context of a motion to suppress—was limited to observations that the defendant appeared "lethargic, kind of sleepy and disoriented." Both of these cases rely on rational observations, well within the ken of a lay person, and which the jury is capable of evaluating.

We conclude that because Raddatz's trial testimony was inarguably that of an expert witness under Idaho Rule of Evidence 702, permitting her to testify without full disclosure as an expert was an abuse of discretion. I.C.R. 16(b)(7). She testified that certain physiological indicia actually mean the opposite of what they seem to mean, and that she knew this because of specialized training, continued study, and research. Under these circumstances, to conclude that Raddatz was testifying as a lay witness would render Rule 702 meaningless. Therefore, we hold that the district court erred in affirming the magistrate court's ruling, which essentially permitted Raddatz to testify as an expert witness without the State properly designating her as such and disclosing the substance of her " downside" testimony.

Dacey makes two additional arguments concerning Rule 702: (1) the magistrate court erred by not allowing him to voir dire Raddatz in aid of his objection to Raddatz's "downside" testimony, and (2) that the magistrate court erred by failing to conduct the appropriate analysis in order to determine whether Raddatz's testimony was admissible expert witness testimony under Rule 702. *See State v. Caliz-Bautista*, 162 Idaho 833, 835–36, 405 P.3d 618, 620–21 (2017) ("To

determine whether expert testimony is admissible, the district court must consider two factors. First, to give expert opinion testimony, a witness must be qualified as an expert on the matter at hand. . . . Second, once the witness is qualified as an expert, the trial court must determine whether the expert's opinion testimony will assist the trier of fact in understanding the evidence."). In light of our above ruling, we do not need to address either of these claims of error. We only note that had the magistrate court granted Dacey's request to voir dire the witness as to the nature, extent, and basis of her testimony in aid of his objections—a common and helpful procedure that trial courts typically allow—the error in this case might have been avoided.

**B. Moving forward, a drug recognition expert must be disclosed as an expert witness under Idaho Criminal Rule 16(b)(7).**

This case arose, in part, because of systemic confusion about whether drug recognition experts must be disclosed as an expert witness under Idaho Criminal Rule 16(b)(7). We acknowledge that trial courts across the state have inconsistently dealt with this issue. Today we conclude that Raddatz's "downside" testimony required expert disclosure for a number of reasons, including that the content of her testimony centered on specialized knowledge based on sources that were undisclosed to Dacey. However, in order to address the inconsistent treatment of drug recognition expert testimony, we take this opportunity to clarify the discovery standard for drug recognition experts.

Going forward, testimony from a drug recognition expert, even when solely based on information from the DRE handbook and matrix, will require that the witness be disclosed as an expert witness pursuant to Idaho Criminal Rule 16(b)(7). Additionally, the disclosure must include "a written summary or report of any testimony that the state intends to introduce at trial or at a hearing pursuant to Rules 702, 703 or 705 of the Idaho Rules of Evidence. The summary provided must describe the witness's opinions, the facts and data for those opinions, and the witness's qualifications." I.C.R. 16(b)(7). Because the role of the drug recognition expert is to *analyze and interpret data* in order to form an *opinion* about the cause of the subject's impairment—rather than passively "plugging" data into a system and reading the result—such evidence is necessarily based on the type of specialized "knowledge, skill, experience, training, or education" contemplated by Rule 702. Therefore, we conclude that such testimony can only be provided by a qualified and properly disclosed expert witness.

14

**C. The district court erred in concluding that any error by the magistrate court in allowing Raddatz to testify as an undisclosed expert witness was harmless.**

On intermediate appeal, the district court concluded that any error from allowing Raddatz to testify as a lay witness was harmless. This issue was not addressed by the magistrate court below, so we must review the district court's legal analysis, based on the facts in the record below.

"A defendant appealing from an objected-to, non-constitutionally-based error shall have the duty to establish that such an error occurred, at which point the State shall have the burden of demonstrating that the error is harmless beyond a reasonable doubt." *State v. Perry*, 150 Idaho 209, 222, 245 P.3d 961, 974 (2010). Recently, in *State v. Garcia*, 166 Idaho 661, 674, 462 P.3d 1125, 1138 (2020), this Court clarified how harmless error is analyzed:

> Harmless error is "error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates [v. Evatt]*, 500 U.S. 391, 403 (1991). Proper application of the *Yates* two-part test requires weighing the probative force of the record as a whole while excluding the erroneous evidence and at the same time comparing it against the probative force of the error. *Id.* at 404. When the effect of the error is minimal compared to the probative force of the record establishing guilt "beyond a reasonable doubt" without the error, it can be said that the error did not contribute to the verdict rendered and is therefore harmless. *Id.* at 404–05.

Thus, the probative value of the error must be weighed and compared to the probative value of the remaining evidence of guilt. *Id.* at 674–75, 462 P.3d at 1138–39.

On intermediate appeal before the district court, the State relied on an incorrect legal standard. The State did not recognize that it had the burden to show the error in allowing Raddatz to testify as a lay witness was harmless beyond a reasonable doubt. Instead, the State incorrectly argued that Dacey had to show the error was reversible. Although the State asserted generally that other incriminating evidence existed against Dacey—such as the field sobriety tests and the blood test results which showed the presence of methamphetamine—it did not compare this evidence against the probative force of allowing Raddatz's "downside" testimony. At most, the State attempted to downplay the testimony as "minor." As we clarified in *Garcia*, however, the probative force of the error *must* be compared to the remaining evidence.

Although the State now attempts to address the force of the error as compared to the other evidence, we cannot consider it. "On an appeal from the district court sitting as an intermediate appellate court, this Court will not consider issues that were not raised before the district court."

15

*Charney v. Charney*, 159 Idaho 62, 68, 356 P.3d 355, 361 (2015). "Generally, 'an issue presented on appeal must have been properly framed and preserved in the court below.' " *Fed. Home Loan Mortg. Corp. v. Butcher*, 157 Idaho 577, 581, 338 P.3d 556, 560 (2014) (quoting *Centers v. Yehezkely,* 109 Idaho 216, 217, 706 P.2d 105, 106 (Ct. App. 1985)). The State failed to conduct the proper analysis before the district court and, therefore, failed to preserve the argument for appeal before this Court.

Even if the issue had been preserved, the totality of the record demonstrates that the error was not harmless. The State asserts that the downside testimony was only a small component of Raddatz's overall testimony about the DRE, and that the downside testimony might even have been helpful to Dacey because it allowed for extensive cross-examination on the parts of the evaluation that did not indicate intoxication. The State adds that the jury had other evidence such as video footage of the DRE and the positive blood test result for methamphetamine, which it could have used to convict Dacey.

Yet, the State's assessment of its case is undercut by its heavy reliance on Raddatz's testimony during closing arguments to make the connection between the methamphetamine found in Dacey's blood and actual impairment. For example, the State made its case for finding that Dacey was on the downside of a methamphetamine high by invoking Raddatz's "experience and her education" as "so valuable" to understanding how drugs react differently in different bodies, because "what goes up must come down." Then the State went through the physical indicators and tests that had appeared normal and reminded the jury that Raddatz had explained these were consistent with "downside" impairment. Specifically, the State invoked Raddatz's authority to claim that Dacey's pupil size would be normal as the body returned to "homeostasis" and pulse rate, blood pressure, and body temperature would also "all [be] returning to normal on the downside." The State concluded that it was "absolutely, absolutely [] convinced and satisfied" with Raddatz's opinion that what she was seeing was due to "a downside influence of the methamphetamine that was found in [Dacey's] system."

Not only did the State rely on Raddatz's *testimony* in order to convince the jury that Dacey was impaired, but in closing it emphasized her *status* as an expert and, without objection, improperly expressed it was "absolutely, absolutely convinced" by her opinion. The State avers that Dacey had ample opportunity to cross-examine Raddatz about the basis of her knowledge, but the point of disclosing expert witnesses prior to trial is fairness. Thus, the mere opportunity

16

to cross-examine is often not enough; it must be an opportunity to *effectively* cross-examine. Refuting expert testimony requires preparation in order to properly examine the basis of the supposed expertise, find counter-examples, challenge the qualifications of the supposed expert, and even call a defense expert to provide a contrary opinion. By allowing Raddatz to present her expertise while cloaked as a lay person, the magistrate court prevented Dacey from a fair opportunity to (1) challenge the substance and scientific basis of Raddatz's opinions, (2) question Raddatz's qualifications, and (3) present his own expert testimony to rebut Raddatz's conclusion that although some of Dacey's vital signs were inconsistent with impairment, they actually signaled impairment in this case. We are required to weigh the probative value of Raddatz's testimony against the probative value of the remaining evidence. Without Raddatz's testimony, we find it likely that the presence of normal physiological indicators in Dacey's evaluation would have created serious doubt as to his impairment in the minds of jurors. Accordingly, we conclude that the error was not harmless.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the district court erred in upholding the magistrate court's ruling that allowed Raddatz to testify as a lay witness. Accordingly, we reverse and remand this case to the district court with direction to vacate Dacey's judgment of conviction and remand it to the magistrate court for further proceedings consistent with this opinion. We also announce that, henceforth, trial testimony from a drug recognition expert requires expert witness disclosure in accordance with Idaho Criminal Rule 16(b)(7).

Chief Justice BEVAN, and Justices BRODY, STEGNER and Justice Pro Tem HORTON **CONCUR.**

17