IN THE SUPREME COURT OF THE STATE OF IDAHO
DOCKET NO. 49461

| STATE OF IDAHO, | ) | |
|---|---|---|
| | ) | |
| Plaintiff-Respondent, | ) | **Boise, June 2022 Term** |
| | ) | |
| v. | ) | **Opinion Filed: September 2, 2022** |
| | ) | |
| MICHANGLO SMITH, | ) | **Melanie Gagnepain, Clerk** |
| | ) | |
| Defendant-Appellant. | ) | |
| _____ | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Lynn G. Norton, District Judge and Thomas F. Neville, Senior District Judge.

The judgments and order of the district court are affirmed.

Eric D. Fredericksen, State Appellant Public Defender, Boise, for Appellant. Sally Cooley argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Respondent. Mark Olson argued.

_____

BRODY, Justice.

Michanglo Smith challenges multiple evidentiary decisions of the district court involving two jury trials. Smith also challenges the district court's order of restitution. During the first trial, a jury found Smith guilty of felony domestic battery with traumatic injury, misdemeanor assault, and misdemeanor false imprisonment. However, the jury was unable to reach a decision on the attempted strangulation charge. The State re-tried Smith on that charge, and after a second trial, a jury found him guilty of attempted strangulation. Smith appealed his convictions and the subsequent restitution order. For the reasons discussed below, we affirm.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

The underlying convictions stem from a violent incident involving Smith and his then girlfriend ("Girlfriend") on the night of January 27, 2018 and lasted into the morning of January

28, 2018. Smith and Girlfriend began dating in August 2017. One month later, the pair moved in together and resided at a hotel in Boise, Idaho. Smith and Girlfriend started to have serious discussions about marriage and in December 2017, Smith and Girlfriend moved into an apartment. During this time, Girlfriend was working at a fast-food restaurant ("Restaurant") in Boise.

On the night of the underlying incident, Girlfriend worked a shift until approximately 10:30 p.m. Before clocking out, Girlfriend had a conversation with her supervisor ("Supervisor") about Girlfriend being promoted to "team lead." After clocking out, Girlfriend drove towards the apartment while speaking on the phone with Smith. However, before Girlfriend reached the apartment, the call dropped. What occurred after that, and into the next morning, was disputed at trial.

According to Smith (who testified during the first trial but not the second), Girlfriend arrived at the apartment roughly fifteen minutes after the call dropped and was "irate and crying and hysterical." Smith further testified that when Girlfriend arrived at the apartment, her face was already "swollen" and "beat up" and that she "attacked" him and started "hollering." According to Smith, Girlfriend was attacked by some other person(s) to whom she owed money.

In contrast, Girlfriend testified that Smith had attacked, threatened, and attempted to strangle her repeatedly—not some other person(s). In the first trial, after hearing from both Girlfriend and Smith, in addition to multiple witnesses corroborating Girlfriend's injuries and reported version of events, the jury convicted Smith on all counts except the attempted strangulation charge. As explained below, following the second trial, the jury convicted Smith on the attempted strangulation charge.

Girlfriend testified that she went straight to the apartment after leaving work that night. When she arrived, she found Smith in the parking lot and in a "very foul mood" because Smith thought she had hung-up on him. Smith began yelling at her in the parking lot. Smith and Girlfriend eventually entered the apartment, and then Girlfriend's phone "went off" when she received a text message. Supervisor had texted Girlfriend to thank her, congratulate her, and tell her that "if [she] wasn't worth it, [Supervisor] wouldn't have even come back in." Smith read the message and "flew off the handle." Girlfriend testified that Smith started cussing, grabbed her around the neck in the kitchen of the apartment, and attempted to strangle her. She testified that this impacted her ability to breathe, and she eventually lost consciousness.

2

Girlfriend testified that when she regained consciousness, she was still in the kitchen, but her necklace was on the floor, broken, and she had wet herself from losing control of her bladder. Smith then began accusing Girlfriend of "sleeping with [Supervisor]." Girlfriend then testified that Smith struck her on the left side of her face, texted Supervisor using Girlfriend's phone, and struck Girlfriend a second time. In these texts, Smith accused Supervisor of calling and texting Girlfriend with "inappropriate bullshit" and threatened that if Supervisor continued to contact Girlfriend "it's going to be some trouble."

Smith then told Girlfriend to get into his vehicle, and although Girlfriend did not want to, she testified that she complied because she did not feel free to refuse. Next, Smith started driving towards the Restaurant with Girlfriend in the front passenger seat. While driving and continuing to accuse Girlfriend of sleeping with Supervisor, Girlfriend testified that Smith struck her near her left eye, in the mouth, and in the chest. After arriving at the Restaurant, Smith went inside, and Girlfriend stayed in the vehicle. After Smith did not locate Supervisor inside the Restaurant, he returned to the vehicle, and demanded that Girlfriend take him to Supervisor's mother's house. Girlfriend responded that she did not know where the woman lived. Girlfriend testified that Smith struck her again, returned to the driver seat, and drove away with her still in the front passenger seat.

While driving away, Girlfriend testified that Smith struck her "a couple more times" on the left side of her face. At one point, Smith parked in front of a theater, pulled out a pocket-knife, tossed it in Girlfriend's lap, and said "use it on me or I'm going to use it on you and claim self-defense." Smith did not stab Girlfriend with the knife, but Girlfriend testified that she was fearful that he would because he was already striking her. Smith took back the knife, began driving again, and eventually pulled into a parking lot at a park.

Girlfriend testified that Smith parked the vehicle, pulled her out of the passenger seat, struck her on the left side of her face, and attempted to strangle her until she lost consciousness for a second time. Girlfriend regained consciousness on the ground, was struck by Smith again, and then Girlfriend ran away from the vehicle. However, Girlfriend testified that she did not get far before Smith "tackled" her on the nearby grass and began "banging" her head on the ground while calling her derogatory names. Smith then picked up Girlfriend and stood her near the hood of his vehicle. Girlfriend testified that Smith threatened to drown her in the nearby pond and to

3

"get rid of [her] body" so "nobody would ever find it." Girlfriend testified that while at the vehicle, Smith again attempted to strangle her until she lost consciousness for a third time.

Girlfriend next testified that she regained consciousness in the apartment's kitchen. Afterwards, Smith was still talking to Girlfriend, but her "head was ringing" so she could not recall everything he was saying. However, Girlfriend testified that she did recall that after waking up in the kitchen, Smith poured Girlfriend's medications in her hand and said: "Why don't you just take these and kill yourself." At some point the next morning, Girlfriend left the apartment and went straight to the Ada County Sheriff's office. However, Girlfriend decided to leave the Sheriff's office before anyone met with her and proceeded to an urgent care facility. Girlfriend arrived at the urgent care around 11:00 a.m. the morning of January 28, 2018. She presented with facial swelling; difficulty speaking; injuries to her mouth and jaw; pain in her chest, head, neck, and back; and difficulty moving her neck. Due to the severity of her presenting injuries, an ambulance was called which transported Girlfriend to the local emergency department.

At the emergency department, Girlfriend described the above events to the medical staff and a responding law enforcement officer. One of the staff included Nurse Jennifer Hordemann. As a result of the above events, Girlfriend suffered multiple injuries including swollen eyes and lips; swollen hands and fingers; bruising on her arm and back; a cut to her lip requiring stitches; an acute head injury; subconjunctival hemorrhages in one eye; and a cut, pain, and swelling on her neck. Imaging of Girlfriend's head was negative for any skull trauma, bone injuries, or brain injuries. In addition, imaging of Girlfriend's neck was negative for damage to arteries, structures, or leakage of blood vessels. She was released from the emergency department later the same day.

One day after discharge, on January 29, 2018, Girlfriend went to FACES of Hope in Boise, for treatment and a forensic domestic violence examination. The treating providers at FACES were Dr. Ashley King and Nurse Anne Wardle. Girlfriend was also treated at a concussion clinic for six to eight weeks where she participated in physical, speech, and vestibular therapies.

## B. Procedural Background.

The State charged Smith with felony domestic battery with traumatic injury, attempted strangulation, first-degree kidnapping, and aggravated assault. Prior to trial, the State disclosed Drs. D. Lee Binnion and King as strangulation experts. On December 10, 2018, the case

4

proceeded to trial. At trial, testimony was heard from Girlfriend, Smith, Supervisor, law enforcement officers, various treatment providers, and Dr. King (strangulation expert and treating provider for Girlfriend at FACES).

Smith's defense theory during the first trial was twofold. First, Smith contended the identity of Girlfriend's assailant was at issue: "There still may be an alternate perpetrator . . . . There is a question as to what happened and who did it." Second, he argued that Girlfriend's version of events was not credible, claiming: "What a tangled web we weave when at first we do deceive." After a four-day trial, the jury found Smith guilty of false imprisonment; domestic battery with traumatic injury; and assault. However, the jury could not reach a unanimous verdict on the attempted strangulation charge.

Roughly three months later, in March 2019, the State re-tried Smith on the attempted strangulation charge. The jury heard testimony from, among others, Girlfriend, Nurse Hordemann, Supervisor, Dr. Binnion (strangulation expert), and Nurse Wardle. Unlike the first trial, Smith exercised his constitutional right to remain silent and did not testify. In addition, Smith's defense theory changed. He no longer challenged the identity of Girlfriend's assailant; instead, he contended that the alleged attempts to strangle Girlfriend simply did not occur because "[t]he marks don't match." After a three-day trial, the jury unanimously found Smith guilty of attempted strangulation.

In April 2019, the district court held a joint sentencing hearing (with Judge Lynn G. Norton who presided over the first trial and Judge Thomas F. Neville who presided over the second). As a result of the sentences from the first and second trials combined, Smith received a unified sentence of twenty-five years, with fifteen years fixed and ten years indeterminate. After a later restitution hearing, the district court also ordered Smith to pay $5,846.12 in combined restitution to Girlfriend and others. Smith timely appealed, challenging multiple evidentiary decisions from the two trials and the order of restitution.

## II. ANALYSIS

### A. Supervisor's testimony in the first trial concerning a prior incident with Smith was relevant to motive and the State's underlying theory of the case.

Smith first challenges the admission of testimony from Supervisor during the first trial regarding a prior "harassing" incident between Supervisor and Smith. Smith contends the

testimony was erroneously admitted because it was irrelevant and unfairly prejudicial. For the reasons discussed below, the district court did not err in admitting the challenged testimony.

"The question of whether evidence is relevant is reviewed de novo, while the decision to admit relevant evidence is reviewed for an abuse of discretion." *State v. Shutz*, 143 Idaho 200, 202, 141 P.3d 1069, 1071 (2006). Under the abuse of discretion standard, we examine "whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *State v. Herrera*, 164 Idaho 261, 270, 429 P.3d 149, 158 (2018).

Supervisor testified that Smith came into the restaurant and "apologized for harassing, calling the store, trying to get ahold of [Girlfriend], and bothering the place of business." Smith made two separate relevancy objections during this line of testimony under Idaho Rule of Evidence 401:

> [THE STATE]: But you reply, now that one, let me see, on State's Exhibit 30K, shows that [a text message] came in at 12:30[a.m.]. And then what was your reply?
>
> [SUPERVISOR]: [Reading] ["]LMAO. You are seriously pathetic, [Smith]. I haven't called you once nor have I said anything to you besides grow up and leave me alone. I never took you to be an insecure boy. *You came at me like a man the first time and I respected that*. But this shit is fucking childish and lame. If you knew anything—["]
>
> [THE STATE]: And State's Exhibit 30L, does this just show this with [sic] it cuts off there at the bottom?
>
> [SUPERVISOR]: It does.
>
> [THE STATE]: But you said that at 1:44 a.m.?
>
> [SUPERVISOR]: Yes.
>
> [THE STATE]: *Now, when you say in here, [*"*]you came at me like a man the first time and I respected that,[*"*] what did you mean by that?*
>
> [SUPERVISOR]: *The first time when [Smith] came in [the Restaurant], when I met him, he came up to me and, like I said, introduced himself.*
>
> [THE STATE]: Okay. And what had preceded him coming in, if you know?
>
> [SUPERVISOR]: The first time?
>
> [THE STATE]: Uh-huh.
>
> [SUPERVISOR]: [Smith and Girlfriend] were having problems and [Smith] was trying to get ahold of [Girlfriend].

6

[THE STATE]: How do you know that?

[SUPERVISOR]: [Girlfriend] came into work. My boss was there, and she said—

[DEFENSE COUNSEL]: *Objection. Relevance to this prior contact.*

[THE STATE]: And if I can ask the witness to actually to—not to go into what she said. So I'm not asking what she said, but did something happen in the restaurant that you were aware of leading up to him coming in?

[SUPERVISOR]: It was my understanding they had—

[DEFENSE COUNSEL]: *Objection. Again, I'll object to relevance to the prior contact.*

[THE STATE]: And I'll withdraw that question. Let me ask you this: while you were in the store that day that he came in and came up and introduced himself to you, had he called the restaurant a number of times?

[SUPERVISOR]: He did.

[THE STATE]: And that's what I'm getting at. What did he tell you when he came in?

[SUPERVISOR]: *Oh, he apologized for harassing, calling the store, trying to get ahold of her, and bothering the place of business.*

[THE STATE]: And so that's what you're referring to here in this text message?

[SUPERVISOR]: Yes, ma'am.

[THE STATE]: Okay. Thank you.

(Emphasis and alterations added.)

Because counsel moved on from the objected to questions before the witness answered, the district court did not contemporaneously rule on the relevancy objections. In addressing a motion for mistrial made by Smith during a recess after Supervisor's testimony was complete, the district court ruled on the objections. The court decided that Supervisor's challenged testimony was relevant to proving identity if Smith and Supervisor met in the Restaurant on January 27, 2018, and for providing context to Supervisor's text that "[Smith] *came at me like a man the first time and I respected that*." (Emphasis added.) On appeal, Smith argues that the challenged testimony was not probative or material to proving Smith's identity. Smith argues that Supervisor testified he never saw Smith at the Restaurant on the night of the underlying incident, thus, the district court's reasoning is in error. In response, the State maintains that Supervisor's testimony was relevant "to establish the relationship and familiarity between Supervisor and Smith, which was critical to the [S]tate's theory of the case." The State's theory, as presented to the jury, was that it was Smith, not some other person(s), who attacked Girlfriend

based on Smith's jealous misperception of Girlfriend's relationship with Supervisor. The State further maintains that Supervisor's testimony provided underlying "context to the references to this prior encounter contained in the admitted text messages."

"In order to be admissible, evidence must first be relevant." *State v. Ochoa*, 169 Idaho 903, 913, 505 P.3d 689, 699 (2022) (citing I.R.E. 402). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." I.R.E. 401. "Whether a fact is of consequence or material is determined by its relationship to the legal theories presented by the parties." *State v. Garcia*, 166 Idaho 661, 670, 462 P.3d 1125, 1134 (2020) (internal quotations omitted). "Relevant evidence is admissible unless [the Idaho Rules of Evidence], or other rules applicable in the courts of this state, provide otherwise." I.R.E. 402. We review relevancy de novo. *Shutz*, 143 Idaho at 202, 141 P.3d at 1071.

Here, although the district court's ruling was not clear, the challenged testimony was relevant to proving Smith's motive. "Motive is a well-accepted method of proving the ultimate facts necessary to establish the commission of a crime, without reliance upon an impermissible inference from bad character." *State v. Russo*, 157 Idaho 299, 308, 336 P.3d 232, 241 (2014) (quoting 29 Am. Jur. 2d *Evidence* § 439 (2008)). "Motive is generally defined as that which leads or tempts the mind to indulge in a particular act." *State v. Stevens*, 93 Idaho 48, 53, 454 P.2d 945, 950 (1969). "Evidence of motive is relevant 'when the existence of a motive is a circumstance tending to make it more probable that the person in question did the act.' " *Russo*, 157 Idaho at 308, 336 P.3d at 241 (quoting 29 Am. Jur. 2d *Evidence* § 439 (2008)).

In this case, the challenged testimony was relevant for purposes of motive because it tended to show it was *Smith* who attacked Girlfriend, and he did so out of jealously. Indeed, the State's theory was that Smith's motive in harming Girlfriend was fueled by his jealous misperception that Supervisor and Girlfriend had an intimate relationship.

Smith alternatively argues that even if Supervisor's challenged testimony was relevant, it was unfairly prejudicial evidence that should have been excluded under Idaho Rule of Evidence 403. However, Smith's discrete challenge to this line of testimony under Rule 403 is not preserved for review independent of the denial of his motion for a mistrial. "Generally[,] Idaho's appellate courts will not consider error not preserved for appeal through an objection at trial." *State v. Capone*, 164 Idaho 118, 122, 426 P.3d 469, 473 (2018) (alteration added) (quoting

*State v. Perry*, 150 Idaho 209, 224, 245 P.3d 961, 976 (2010)). If an "alleged error was followed by a contemporaneous objection at trial, appellate courts employ the harmless error test[.]" *Herrera*, 164 Idaho at 266, 429 P.3d at 154. However, if an "alleged error was *not* followed by a contemporaneous objection at trial, it shall only be reviewed by an appellate court under Idaho's fundamental error doctrine." *Id*. at 267, 429 P.3d at 155 (emphasis added) (quoting *Perry*, 150 Idaho at 228, 245 P.3d at 980).

Here, Smith's defense counsel only contemporaneously objected to Supervisor's above testimony based on relevance. Smith's counsel did not contemporaneously object in the alternative under Rule 403. Nevertheless, Smith's defense counsel did make a Rule 403 objection after Supervisor was excused, when Smith moved for a mistrial. Accordingly, we need not independently review Smith's Rule 403 challenge under our fundamental error doctrine. Instead, we review it for harmless error in the context it was made—the denial of Smith's motion for a mistrial.

## B. The district court did not err in denying Smith's motion for a mistrial because any errors underlying Smith's motion were harmless beyond a reasonable doubt.

When Smith moved for a mistrial in the district court, he objected that Supervisor's challenged testimony was both irrelevant and unfairly prejudicial because the jury could consider past "harassing" conduct by Smith. From this, the district court treated Smith's motion as one based on three rules of evidence: Rule 401 (relevance), Rule 403 (unfair prejudice), and Rule 404(b) ("other acts"). Ultimately, the district court denied Smith's motion, concluding there was no underlying error that warranted a mistrial. On appeal, Smith maintains that the district court erred in admitting Supervisor's testimony for the same reasons he objected to it below and erred in denying his motion for a mistrial. Normally, we would first address the underlying errors alleged by Smith. However, in this matter, the record concerning Smith's objections and the district court's rulings is less than clear. Because of this, we will assume error and address Smith's challenge from a harmless error standpoint.

For the reasons discussed below, we hold that any error in admitting Supervisor's challenged testimony was harmless beyond a reasonable doubt. Thus, the district court's refusal to declare a mistrial did not constitute reversible error.

"A mistrial may be declared on motion of the defendant when there occurs during the trial, either inside or outside the courtroom, an error or legal defect in the proceedings, or

9

conduct that is prejudicial to the defendant and deprives the defendant of a fair trial." I.C.R. 29.1(a). When the Court reviews the denial of a motion for mistrial in a criminal case, the question

> is not whether the trial judge reasonably exercised his discretion in light of circumstances existing when the mistrial motion was made. Rather, the question must be whether the event which precipitated the motion for mistrial represented reversible error when viewed in the context of the full record. Thus, where a motion for mistrial has been denied in a criminal case, the "abuse of discretion" standard is a misnomer. The standard, more accurately stated, is one of reversible error. Our focus is upon the continuing impact on the trial of the incident that triggered the mistrial motion. The trial judge's refusal to declare a mistrial will be disturbed only if that incident, viewed retrospectively, constituted reversible error.

*State v. Johnson*, 163 Idaho 412, 421, 414 P.3d 234, 243 (2018) (quoting *State v. Sandoval-Tena*, 138 Idaho 908, 912, 71 P.3d 1055, 1059 (2003)).

"A defendant appealing from an objected-to, non-constitutionally-based error shall have the duty to establish that such an error occurred, at which point the State shall have the burden of demonstrating that the error is harmless beyond a reasonable doubt." *State v. Montgomery*, 163 Idaho 40, 46, 408 P.3d 38, 44 (2017) (quoting *Perry*, 150 Idaho at 222, 245 P.3d at 974).

"Harmless error is 'error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " *Garcia,* 166 Idaho at 674, 462 P.3d at 1138 (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991)). To determine whether the error is harmless beyond a reasonable doubt, we weigh "the probative force of the record as a whole while excluding the erroneous evidence and at the same time compar[e] it against the probative force of the error." *Garcia*, 166 Idaho at 674, 462 P.3d at 1138. "When the effect of the error is minimal compared to the probative force of the record establishing guilt 'beyond reasonable doubt' without the error, it can be said that the error did not contribute to the verdict rendered and is therefore harmless." *Id*.

Here, when Supervisor's challenged testimony is excluded, the probative force of the remaining record supporting Smith's guilt beyond a reasonable doubt is substantial. During the first trial, Girlfriend testified in detail to the violence she suffered at the hands of Smith. Starting at the apartment, Girlfriend testified that after she arrived, Smith saw a text from Supervisor and "flew off the handle." During that night, and into the next morning, Girlfriend testified that Smith hit her numerous times in the face, chest, and abdomen, and at one point, threatened her with a knife. Smith strangled Girlfriend on at least three occasions with sufficient force to cause

10

her to lose consciousness at three different times. Smith also took Girlfriend to the Restaurant that night, against her will, in an apparent attempt to confront Supervisor about the intimate relationship Smith thought existed between Supervisor and Girlfriend. Girlfriend's injuries were corroborated by multiple treatment providers; law enforcement officials; and the photographs of injuries to her eyes, lips, hands, extremities, back, neck, and head. In addition, the admitted text messages sent by Smith to Supervisor that night corroborated the State's theory that Smith's motive in attacking Girlfriend stemmed from Smith's jealous misperception of Supervisor and Girlfriend's relationship.

In contrast, the probative force of any error in admitting Supervisor's challenged testimony was minimal. Supervisor's testimony was not about a prior violent act by Smith against Girlfriend similar to the underlying charges against him. Indeed, Supervisor's testimony falls far short of the type of unfair prejudice inherent in "other acts" testimony that deals with sexual deviancy or prior uncharged violent acts similar to the underlying charged act. *See, e.g.*, *State v. Johnson*, 148 Idaho 664, 670, 227 P.3d 918, 924 (2010) ("Evidence of prior sexual misconduct with young children is so prejudicial that there is a reasonable probability that this error contributed to Johnson's conviction."). For these reasons, the probative force of any error in admitting Supervisor's challenged testimony was minimal, did not have a continuing impact on the trial, and does not outweigh the probative force of the record without such error.

Therefore, the district court's refusal to grant Smith's motion for a mistrial based on any error in admitting Supervisor's challenged testimony does not constitute reversible error. The evidence admitted was unimportant given the quantum of evidence of Smith's guilt. Any error in admitting the evidence was harmless.

## C. The district court did not abuse its discretion in the first trial by allowing the State to reopen its case after the close of Smith's evidence.

Smith next argues that the district court abused its discretion by allowing the prosecutor to reopen the State's "case-in-chief" to present additional evidence that Smith and Girlfriend were in an "intimate" relationship at the time of the underlying incident. The State responds that the prosecutor was simply rebutting the defense's theory that Smith and Girlfriend were not in an "intimate" relationship (one of the elements of the felony domestic battery charge). For the reasons below, Smith's argument is unavailing.

11

Trial courts have the authority to reopen a case prior to final judgment. *Davison's Air Serv., Inc. v. Montierth*, 119 Idaho 967, 968, 812 P.2d 274, 275 (1991). "Such action may be taken by the court on motion of a party or on the court's own motion." *Idaho Power Co. v. Cogeneration, Inc.*, 134 Idaho 738, 743, 9 P.3d 1204, 1209 (2000). When a party moves to reopen, that party must show "some reasonable excuse, such as oversight, inability to produce the evidence, or ignorance of the evidence." *Id.* at 744, 9 P.3d at 1210. The trial court's decision on whether to reopen a case, and take new evidence prior to the entry of judgment, is "within its discretion and will not be reversed on appeal absent a showing of abuse." *Montierth*, 119 Idaho at 968, 812 P.2d at 275. When this Court reviews an alleged abuse of discretion, it applies the four-prong test articulated in *Herrera*, 164 Idaho at 270, 429 P.3d at 158.

Here, after the State and Smith both had rested, the parties and the district court held a jury instruction conference. Related to the felony domestic battery charge, I.C. §§ 18-903(a) and -918(2), Smith proposed a nonstandard instruction to further define the term "cohabiting" under "household member" as requiring an "intimate" relationship. Smith's proposed instruction relied on the interpretation of sections 18-903 and -918(2) in *State v. Schulz*, that " 'cohabiting' is a long-recognized term of art plainly denoting an intimate relationship." 151 Idaho 863, 867, 264 P.3d 970, 974 (2011). Smith argued his proposed instruction was part of his defense theory because Smith testified that he and Girlfriend were not in an "intimate" relationship at the time of the underlying incident. The State objected and claimed unfair surprise. The State argued that Smith failed to timely submit his proposed instruction by the pretrial conference as required in the scheduling order. In addition, the State pointed out that Smith's proposed instruction to add "intimate" to the definition of "household members" has not been incorporated into the Idaho Criminal Jury Instructions ("ICJI") since *Schulz* was released. *See* ICJI 1277.

After hearing argument from both parties, the district court determined it would charge the jury with Smith's added "intimate" definition. In response, the State moved to reopen its case so it could go into further detail about the intimate nature of Girlfriend's relationship with Smith at the time of the underlying incident. The district court granted the State's motion. The court reasoned that despite the State having the burden of proof on the "household member" element, the State was unlikely to anticipate this particular theory from the defense and the proposed instruction was untimely. From this, the court allowed the State to recall Girlfriend and Detective Chad Wigington on this limited issue, noting that what it was doing, in substance, was

12

"reopening rebuttal[.]" The court also pointed out that "[Smith] still [has] the opportunity for surrebuttal."

After the State reopened its case, Girlfriend testified that she was in an intimate and sexual relationship with Smith at the time of the underlying incident, and only broke-up with Smith afterwards. On the same topic, Detective Wiginton testified that Smith had referred to Girlfriend as his fiancé during an interview, and that Smith had declined a "three-way" proposition by another female while Smith and Girlfriend were at a bar. On appeal, Smith argues the district court abused its discretion in granting the State's motion because it failed to (1) act consistently with the legal standards applicable to the specific choices available to it; and (2) it did not reach its decision through an exercise of reason. Although Smith properly argues under discrete prongs of the abuse of discretion test, he has not shown the district court abused its discretion.

First, Smith has not shown that the district court applied an incorrect legal standard. The law required the State to proffer a "reasonable excuse" to warrant additional evidence—which the State did when it claimed unfair surprise—and the court accepted the State's excuse. *See Idaho Power Co.*, 134 Idaho at 744, 9 P.3d at 1210. Thus, contrary to Smith's position, the district court acted consistently with the legal standards applicable to the specific choices available to it.

Second, the district court's decision *was* reached through an exercise of reason. Smith simply disagrees with the reasoning adopted and improperly asks this Court to substitute its judgment and discretion for that of the district court. *See State v. Taylor*, 157 Idaho 186, 190, 335 P.3d 31, 35 (2014). Here, the district court concluded that the State was surprised by Smith's untimely motion for a new jury instruction. The State had no reason to think, prior to Smith's testimony at trial, that Smith would deny being in an intimate relationship with Girlfriend. Indeed, even Smith's defense counsel admitted she did not develop her theory to support the new instruction until *after* the State's case-in-chief:

> [DEFENSE COUNSEL]: . . . . [I]t was not until further discussions after the State had put on their case with my client that this issue truly came up. It was at that point that we made the decision to explore this.

The district court further noted the untimeliness of Smith's proposed instruction, and its absence in the applicable statute and ICJI. This was an exercise of reason. Thus, Smith has not shown the district court abused its discretion when it allowed the State to reopen its case.

13

**D. The admission of the "three-way" proposition testimony during the first trial was harmless beyond a reasonable doubt.**

Smith next argues that, in the first trial, the district court erred in admitting irrelevant testimony regarding an incident at a bar where a female stranger propositioned Smith and Girlfriend for a "three-way" and Smith declined. The State responds that "the prosecutor's challenged question sought admissible evidence relating to the nature of Smith's and Girlfriend's relationship, and that the witness's answer was probative to that end." In the alternative, even if the testimony was irrelevant, the State maintains any error in admitting it was harmless. For the reasons below, although we agree that the "three-way" testimony was irrelevant, we conclude that any error in admitting it was harmless beyond a reasonable doubt.

"The question of whether evidence is relevant is reviewed de novo[.]" *Shutz*, 143 Idaho at 202, 141 P.3d at 1071. The test for relevancy is stated in Section II.A, *supra*. Here, the district court permitted the State to reopen its case to present further evidence that Smith and Girlfriend were in an "intimate" relationship at the time of the underlying incident. After Girlfriend testified to the same, the State called Detective Wigington—an officer who had spoken to Smith about his relationship with Girlfriend. The State asked Detective Wigington about the nature of Smith's and Girlfriend's relationship in the following exchange, during which, the district court overruled Smith's relevancy objections:

> [THE STATE]: And in speaking with [Smith] on the 28th, in what terms did he describe he [sic] and [Girlfriend's] relationship?
>
> [DET. WIGINGTON]: That they had talked about marriage. I think [Smith] referred to her as a finacee [sic] during the interview, as well as the multiple times that he expressed his love for her.
>
> [THE STATE]: And specifically as to a sexual relationship, did he describe if he was having a sexual relationship or a scenario where he was—I guess sex was solicited for [sic] him?
>
> [DEFENSE COUNSEL]: *Objection, relevance.*
>
> THE COURT: Overruled.
>
> [THE STATE]: You may answer.
>
> [DET. WIGINGTON]: At one time during the interview, [Smith] commented about being, I believe, at the Varsity Pub, [sic] was approached by another female to have a three-way.
>
> [THE STATE]: Did he describe if [Girlfriend] was with him at that time?
>
> [DET. WIGINGTON]: I believe so, yes.

14

[THE STATE]: And did he describe what his response was at the request to have a three-way with he and [Girlfriend]?

[DEFENSE COUNSEL]: *Objection, relevance.*

THE COURT: Overruled.

[DET. WIGINGTON]: I think he indicated that it wasn't his style or wasn't his thing. I'm not sure of his exact words.

[THE STATE]: Okay. Did you ever specifically ask him to define his relationship with [Girlfriend]?

[DET. WIGINGTON]: No, I did not.

[THE STATE]: Did he ever point out to you or try and say that it was just a roommate situation?

[DET. WIGINGTON]: No.

(Emphasis and alterations added.)

On appeal, Smith argues that the "discussion of the three-way was not relevant where it did not make any material fact 'more or less probable.' " Smith maintains that "[t]he fact that a stranger in a bar asked [Smith] if he would be interested in participating in sexual activity with her and [Girlfriend] does not establish a dating or sexual relationship between [Girlfriend] and [Smith] and serves only to besmirch [Smith's] character." Except for his "only to besmirch" comment, we agree with Smith. The "three-way" testimony had no tendency to make it more probable that Smith and Girlfriend were in an intimate relationship than it would be without the testimony. Thus, district court admitted it in error because it was irrelevant.

Nevertheless, we conclude that the error in admitting the "three-way" testimony was harmless beyond a reasonable doubt. As explained above, we determine whether an error is harmless beyond a reasonable doubt by applying the test articulated in *Garcia*, 166 Idaho at 674, 462 P.3d at 1138. Here, with Detective Wigington's "three-way" testimony excluded, the probative force of the record establishing Smith's guilt beyond a reasonable doubt outweighs the probative force of admitting the "three-way" testimony in error. Although Smith testified that he was not in a "relationship" with Girlfriend at the time of the underlying incident, the State presented significant evidence to the contrary. For example, Girlfriend testified that she was in an intimate and sexual relationship with Smith until after he attacked her; Detective Wigington testified that Smith had referred to Girlfriend as his fiancé during an interview (impeaching Smith's testimony to the contrary); and throughout the first trial, multiple witnesses corroborated Girlfriend's testimony that she reported being in an intimate relationship with Smith. Thus, even

15

when the "three-way" testimony is excluded, there remains forceful evidence that Smith and Girlfriend were in an intimate relationship for purposes of the felony domestic battery charge.

In contrast, the probative force of the error in admitting the "three-way" testimony from Detective Wigington was minimal. Contrary to Smith's position, it does not necessarily "besmirch" Smith's character in an unfairly prejudicial way. We do not deny that a reasonable juror could find this incident offensive to his or her sensibilities. However, such offense would tend to unfairly prejudice the stranger who solicited the "three-way"—not the party who declined the offer (i.e., Smith). Moreover, a reasonable juror could also find Smith's fidelity to Girlfriend in declining the solicitation to be a positive character trait. Thus, the error in admitting the "three-way" testimony was unimportant and does not undermine the probative force of the record in establishing Smith's guilt without the error. In sum, the error in admitting the testimony was harmless beyond a reasonable doubt.

**E. The district court erred in allowing Nurse Wardle to offer an undisclosed expert opinion while testifying; however, the error was harmless beyond a reasonable doubt.**

Smith next argues the district court abused its discretion during the second trial by allowing Nurse Wardle to offer undisclosed expert opinion testimony regarding the appearance of bruising on African American skin. In response, the State maintains that Nurse Wardle's opinion testimony was based on her own rational perception and common knowledge—not scientific, technical, or specialized knowledge. In other words, the State maintains that Nurse Wardle's opinion testimony was properly admitted under Idaho Rule of Evidence 701 and did not constitute an expert opinion under Rule 702, which would be subject to disclosure requirements set forth in Idaho Criminal Rule 16(b)(7). Alternatively, the State argues that even if Nurse Wardle's opinion was only admissible under Rule 702, any error in admitting it under Rule 701 was harmless beyond a reasonable doubt. For the reasons discussed below, we conclude the district court erred in admitting the opinion testimony under Rule 701. However, the error was harmless beyond a reasonable doubt.

"When reviewing the trial court's evidentiary rulings, this Court applies an abuse of discretion standard." *State v. Hall*, 163 Idaho 744, 773, 419 P.3d 1042, 1071 (2018). "The decision to admit opinion testimony, whether lay opinion or expert opinion, rests within the discretion of the lower court, while the determination of its weight lies with the jury." *State v. Almaraz*, 154 Idaho 584, 602, 301 P.3d 242, 260 (2013) (citing *State v. Cutler*, 94 Idaho 295,

16

299, 486 P.2d 1008, 1013 (1971)). We determine whether a trial court abused its discretion by applying the four-prong test articulated in *Herrera*, 164 Idaho at 270, 429 P.3d at 158.

**1. The line between lay opinion testimony under Idaho Rule of Evidence 701 and expert opinion testimony under Rule 702.**

Nurse Wardle was a treating provider for Girlfriend who participated in her forensic domestic violence exam at FACES. The State only disclosed Nurse Wardle as a lay witness—not an expert witness. On appeal, Smith challenges two portions of Nurse Wardle's testimony as constituting expert opinions under Rule 702: (1) Nurse Wardle's comparison of before and after photos of Girlfriend's neck and her opinion that certain "dark discolorations" could be bruises; and (2) Nurse Wardle's opinion on how bruises appear and are diagnosed on African American skin tones, such as Girlfriend's. Because the line between what is lay opinion testimony versus expert opinion testimony can be blurry, we begin by addressing the testimony from Nurse Wardle that is not in dispute.

To be admissible, testimony must first be relevant. *Ochoa*, 169 Idaho at 913, 505 P.3d at 699; I.R.E. 402. Next, under Idaho Rule of Evidence 602, a witness must have sufficient personal knowledge of the matter to which he or she is testifying. Generally, testimony satisfies Rule 602 "if the jury or other trier of fact could reasonably find that the witness perceived the event." *State v. Gutierrez*, 143 Idaho 289, 293, 141 P.3d 1158, 1162 (Ct. App. 2006) (citing *United States v. Owens-El*, 889 F.2d 913, 915 (9th Cir. 1989)). This requirement applies to lay testimony, but "does not apply to a witness's expert testimony under Rule 703." I.R.E. 602. Thus, when it comes to testimony from treatment providers, like Nurse Wardle, what that provider perceived, heard, and observed in treating a patient is admissible through Rules 402 and 602.

Here, the parties do not dispute that Nurse Wardle permissibly testified to, as a treatment provider, her personal knowledge of Girlfriend's presenting condition, symptoms, and complaints during the FACES forensic exam. For example, Nurse Wardle testified that Girlfriend presented with and reported: loss of memory, involuntary urination, difficulty breathing, lightheadedness, pain and difficulty with swallowing, drooling, persistent throat pain, hoarse voice, and loss of consciousness on multiple occasions. Nurse Wardle also testified that she observed some of the above complaints and symptoms herself. That said, the parties dispute whether Nurse Wardle's opinions concerning the cause of certain marks or discolorations that

17

she observed on Girlfriend's skin ventured outside the boundaries of lay witness opinion testimony and into opinions only admissible through a qualified expert under Rule 702. To answer this question, we start from the common law rule that prohibited lay witnesses from providing *any* opinion testimony.

"At common law, witnesses not qualifying as experts were not permitted to draw conclusions which could be characterized as opinion testimony, but rather were required to limit their testimony to *facts*, those things they had seen, heard, felt, smelled, tasted, or done." *Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1195 (3d Cir. 1995) (emphasis added) (internal quotations omitted); *see, e.g.*, *Territory v. McKern*, 3 Idaho 15, 18, 26 P. 123, 124–25 (1891) ("It is not proper to permit a witness, except in the case of an expert, to testify as to his opinion in regard to a fact, or the occurrence of a fact.").

However, courts eventually acknowledged the "practical impossibility of determining by rule" what constitutes a "fact" free from opinion. Fed. R. Evid. 701 advisory committee's note to 1972 proposed rules (citing 7 Wigmore, Evidence § 1919). Indeed, "Wigmore declared, in the first edition of his treatise, that this distinction '[had] done more than any one rule of procedure to reduce our litigation towards a sense of legalized gambling.' " *Asplundh Mfg. Div.*, 57 F.3d at 1195 (alteration added) (quoting 3 Wigmore, Evidence § 1929, at 2563 (1st ed. 1904)). As the United States Supreme Court later observed, "the distinction between statements of fact and opinion is, at best, one of degree[.]" *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 168 (1988). Thus, carving out a useful dichotomy proved "too elusive and too unadaptable to particular situations for purposes of satisfactory judicial administration." Fed. R. Evid. 701 advisory committee's note to 1972 proposed rules.

Judge Learned Hand observed this problem, and suggested, consistent with Wigmore, that a more liberal approach to "opinion" testimony was needed:

> The truth is, as Mr. Wigmore has observed at length (sections 1917-1929), that the exclusion of opinion evidence has been carried beyond reason in this country, and that it would be a large advance if courts were to admit it with freedom. The line between opinion and fact is at best only one of degree . . . . Every judge of experience in the trial of causes has again and again seen the whole story garbled, because of insistence upon a form with which the witness cannot comply, since, like most men, *he is unaware of the extent to which inference enters into his perceptions*. He is telling the "facts" in the only way that he knows how, and the

18

result of nagging and checking him is often to choke him altogether, which is, indeed, usually its purpose.

*Cent. R. Co. of New Jersey v. Monahan*, 11 F.2d 212, 214 (2d Cir. 1926) (emphasis added); *see also* 7 Wigmore, Evidence § 1917–19 (Chadbourn rev. 1978).

The solution to this problem was Federal Rule of Evidence 701. *See Asplundh Mfg. Div.*, 57 F.3d at 1195. Rule 701 "liberalizes" the common law rule by permitting, in certain circumstances, "lay" testimony in the form of an opinion or inference. 1 McCormick on Evid. § 11 (8th ed.). Idaho Rule of Evidence 701 is identical to Federal Rule of Evidence 701, and we interpret our evidentiary rules "in conformance with the interpretation placed upon the same rules by the federal courts." *State v. Stanfield*, 158 Idaho 327, 341 n.10, 347 P.3d 175, 189 n.10 (2015). Idaho Rule of Evidence 701, like its federal counterpart, has three requirements for the admission of lay opinion testimony and reads in full as follows:

> If a witness is not testifying as an expert, testimony in the form of an opinion or inference is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

I.R.E. 701.

In contrast, Idaho Rule of Evidence 702 establishes different requirements for the admission of expert opinion testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

I.R.E. 702.

Rules 701 and 702 represent the modern view of opinion evidence and the general movement away from "fine distinctions" between fact and opinion. *See Asplundh Mfg. Div.*, 57 F.3d at 1195; *Beech Aircraft Corp.*, 488 U.S. at 169 (noting the relaxing of "traditional barriers" to opinion testimony in Federal Rules of Evidence 701–705). Thus, in the modern era, the new focus is on the distinction between lay opinion testimony and expert opinion testimony. *See United States v. Perkins*, 470 F.3d 150, 155–56 (4th Cir. 2006).

However, "[b]ecause Rule 701 'does not distinguish between expert and lay *witnesses*, but rather between expert and lay *testimony*,' " there is a fine line between lay opinion testimony under Rule 701 and expert testimony under Rule 702. *Perkins*, 470 F.3d at 155 (internal citation omitted) (emphasis original). Drawing the line is critical but not always an easy task. *See United States v. Ayala-Pizarro*, 407 F.3d 25, 28 (1st Cir. 2005); 1 McCormick on Evid. § 11 (8th ed.) (noting courts are frequently called on to analyze the "lay" opinion testimony of police officers and medical treatment providers). Indeed, because the line turns on *testimony*, courts must remain mindful that the same witness, not disclosed as an expert, could offer both a lay and expert opinion in one trip to the witness stand.

For example, there is the proverbial "expert in lay witness clothing" who, if going unnoticed, can evade the reliability requirements of Rule 702 and mandatory discovery requirements for experts. *See United States v. Natal*, 849 F.3d 530, 536 (2d Cir. 2017) (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendment); 1 McCormick on Evid. § 11 (8th ed.) (explaining that subsection (c) of Rule 701 was added to combat this growing problem). For example, in *United States v. Figueroa-Lopez*, the court held that an agent *could* opine movements of a vehicle were "suspicious" but, without first being qualified as an expert, the agent *could not* opine on what behaviors were consistent with an "experienced" drug trafficker. 125 F.3d 1241, 1246 (9th Cir. 1997). The mere rational perception of the agent "to the facts on which he wishes to tender an opinion does not trump Rule 702." *Id*. Otherwise, "a layperson witnessing the removal of a bullet from a heart during an autopsy could opine as to the cause of the decedent's death." *Id*.

The other scenario is a lay witness who improperly puts on the hat of an expert and testifies to an opinion he or she is not qualified to give. For example, in *Dodge-Farrar v. Am. Cleaning Servs. Co.*, the Court of Appeals held that a lay plaintiff *could* opine that a fall caused immediate pain, swelling, and difficulty walking—as this was within "the usual and ordinary experience of the average person." 137 Idaho 838, 843, 54 P.3d 954, 959 (Ct. App. 2002). However, the plaintiff *could not* opine that the same fall caused a permanent ankle deformity, as it existed months or years after the fall, because reliably opining on any causal link requires the application of specialized knowledge beyond what is common to all. *Id*.

Accordingly, drawing the line between lay versus expert opinion testimony primarily turns on subsections (a) and (c) in Rule 701. *See* 1 McCormick on Evid. § 11 (8th ed.). To

20

reiterate, those subsections allow a lay witness to testify to an opinion or inference only if it is: "(a) rationally based on the witness's perception" (i.e., the personal knowledge requirement under Rule 602); and "(c) *not* based on scientific, technical, or other specialized knowledge within the scope of Rule 702." I.R.E. 701 (emphasis added). "When either element is missing, if the opinion is to be admitted at all, it must satisfy the requirements for expert testimony." 1 McCormick on Evid. § 11 (8th ed.).

Next, under Rule 701(c), there are two ends of the spectrum. First, opinion testimony is lay, and conforms to Rule 701(c), if it is based on the "usual and ordinary experience of the average person[.]" *Kolln v. Saint Luke's Reg'l Med. Ctr.*, 130 Idaho 323, 330, 940 P.2d 1142, 1149 (1997). Lay opinion testimony "results from a process of reasoning familiar in everyday life," while expert opinion testimony "results from a process of reasoning which can be mastered only by specialists in the field." Fed. R. Evid. 701 advisory committee's notes to 2000 amendment (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)). More precisely, "the opinion must be able to be drawn following observation by any person possessing a generally present background, i.e., common knowledge[.]" 5 Handbook of Fed. Evid. § 701:1 (9th ed.).

Second, at the other end of the spectrum, opinion testimony will run afoul of Rule 701(c) if it is "wholly scientific" or "so far removed" from the common knowledge and experience of the average person "that expert knowledge is essential to the formation of an intelligent opinion[.]" *Evans v. Twin Falls Cnty.*, 118 Idaho 210, 214, 796 P.2d 87, 91 (1990). In that case, the opinion falls into Rule 702 territory and may only be admitted through an expert. *See, e.g.*, *Holdaway v. Broulim's Supermarket*, 158 Idaho 606, 612, 349 P.3d 1197 (2015) (holding an injured plaintiff could not opine on the cause of a fractured titanium screw); *Evans*, 118 Idaho at 214, 796 P.2d at 91 (holding a husband could not opine that events on a particular date caused his wife's later death by cardiac arrest).

As a practical matter, we recognize that determining whether an opinion's subject matter is *sufficiently* arcane or peculiar enough to run afoul of Rule 701(c) and fall under the purview of Rule 702 can be elusive. Because of this, if courts attempt to divine what constitutes "common knowledge"—without first analyzing *how* the witness reached the opinion—the "usual and ordinary experience of the average person" risks becoming the "usual and ordinary experience of whoever wears the robe and holds the gavel." Accordingly, we emphasize that trial courts should not merely focus on "whether the witness has an unusual experience base but rather whether the

21

witness is using a reliable and specialized mode of analysis . . . something beyond everyday reasoning—to draw [an] inference [or opinion] from the information base[.]" 1 McCormick on Evid. § 11 n.56 (8th ed.) (internal quotations omitted).

Still, the appropriate line will depend on the facts and circumstances of a particular case. Thus, we have traditionally left most of the line drawing to the sound discretion of our trial courts. *See Evans*, 118 Idaho at 213–14, 796 P.2d at 90–91. However, if a particular line is challenged, we may clarify the choices available to a trial court in exercising its discretionary line drawing. For example, in *State v. Dacey*, 169 Idaho 102, 109, 491 P.3d 1205, 1212 (2021), we corrected the line, previously disagreed on by trial courts, when it comes to opinion testimony from an officer certified as a drug recognition expert ("DRE officer"). In *Dacey*, a DRE officer, not disclosed as an expert, testified that Dacey was still under the influence of methamphetamine, admittedly consumed six days earlier, while in control of a motor vehicle. *Id.* at 104, 491 P.3d at 1207. Specifically, the DRE officer opined that Dacey was on the "downside" of a methamphetamine high based on Dacey's overall test performance, abnormal physiological indicators, and *normal* physiological indicators. *Id.* The magistrate court admitted the DRE officer's opinion under Rule 701. *Id.* at 109–10, 491 P.3d at 1212–13.

On appeal, we reversed and held that the DRE officer's opinion was "inarguably that of an expert witness under Idaho Rule of Evidence 702[.]" *Id.* at 111, 491 P.3d at 1214. The DRE officer had opined that Dacey's *normal* physiological indicia (blood pressure, pupil size, body temperature, and pulse) supported the officer's conclusion that Dacey was still impaired. *Id.* In other words, according to the DRE officer, Dacey's *normal* indicators meant the "opposite" of what they commonly mean to the average person. *Id.* The DRE officer reached her "downside" opinion by *interpreting* the drug recognition exam results using a specialized mode of analysis purportedly based on her training, continued study, and research. *Id.* She did not reach her opinion by simply plugging information into a matrix and *passively* receiving whatever result emerged. *Id.* at 110–12, 491 P.3d at 1213–15. In sum, the DRE officer went beyond every day reasoning and "applied her training and knowledge to the totality of the circumstances in order to form *her own opinion.*" *Id.* at 110, 491 P.3d at 1213 (emphasis in original). Thus, we concluded that the DRE officer's opinion was an expert opinion only admissible under Rule 702. *Id.* at 111, 491 P.3d at 1214.

Importantly, *Dacey* adds two lenses for trial courts to look through when drawing the line between lay and expert opinion testimony. These lenses do not replace the "common knowledge" inquiry; instead, they add to it by focusing on *how* the witness reached the opinion or inference. First, an opinion or inference conforms to Rule 701(c) if it is reached through the application of every day reasoning or the consultation of a resource available to the general public. *See Dacey*, 169 Idaho at 109, 491 P.3d at 1212; *see, e.g.*, *State v. Hall*, 163 Idaho 744, 773, 419 P.3d 1042, 1071 (2018) (holding an officer's inference that a suspect could be eliminated after receiving a negative DNA result was admissible under Rule 701); *State v. Youmans*, 161 Idaho 4, 8, 383 P.3d 143, 146 (Ct. App. 2016) (holding an officer's opinion that pills were hydrocodone was admissible under Rule 701 because it was based on a result from an online database). Second, an opinion or inference does not conform to Rule 701(c), and thereby falls under the purview of Rule 702, if it is reached through a special mode of reasoning, i.e., the application of scientific, technical, or specialized knowledge (or tools) not generally known, or available to, the general public. *See Dacey*, 169 Idaho at 109, 491 P.3d at 1212.

With these principles clarified, we return to the facts of Smith's case.

## 2. Nurse Wardle provided expert opinion testimony.

On appeal, Smith challenges Nurse Wardle as an expert in lay witness clothing who evaded the mandatory expert disclosure requirements in Idaho Criminal Rule 16(b)(7). As explained above, Smith argues Nurse Wardle testified to an expert opinion two times: first, on direct, when she compared before and after photos of Girlfriend's neck to conclude "dark discolorations" could be bruises; and second, on re-direct, when she explained how bruising appears on African American skin tones and how it is diagnosed differently from paler skin. The relevant testimony was as follows:

[DIRECT]

. . . .

[THE STATE]: . . . . And then is it fair to say that you noted this mark that kind of appears to have a whiter center on [Girlfriend], on the right side of her neck in State's Exhibit 19, that you noted that on your diagram as a potential injury from the strangulation?

[NURSE WARDLE]: Yes.

[THE STATE]: And then, on State's Exhibit 21, which is the other side of her neck, is it fair to say that you noted, again, this white mark or scrape on State's Exhibit 21 also on your diagram?

23

[NURSE WARDLE]: Yes.

[THE STATE]: *Now, as far as the darker, the discoloration of her skin here on 21 kind of surrounding that white mark, do you know if that is bruising?*

[NURSE WARDLE]: *I wasn't sure at the time because this is the first time I've seen [Girlfriend], so I wasn't sure if that was the normal coloration of her skin.*

[THE STATE]: *Okay. And so if you were shown State's Exhibit 28 here now, which is a much more recent picture, and the lighting is not so great, so if you want to look at this up close, we're happy to provide it to you, but would you agree that it appears as though that darkness surrounding that white spot has healed or gone away in State's Exhibit 28?*

[NURSE WARDLE]: *Yes.*

[THE STATE]: *What, medically speaking, does that indicate to you regarding what that dark—that darkness is on [Girlfriend] in State's Exhibit 21?*

[DEFENSE COUNSEL]: *Objection. There was no disclosure made that she would be proffering this type of an opinion.*

THE COURT: Would you restate your last question? I didn't understand it to be an opinion question, but would you restate it?

[THE STATE]: Could I ask Madam Court Reporter to read it? Because I don't think that I would do it justice.

THE COURT: Madam Court Reporter, would you mind reading the last question for Madam Prosecutor?

> (Record read as follows: "What, medically speaking, does that indicate to you regarding what that dark—that darkness is on [Girlfriend] in State's Exhibit 21?")

[DEFENSE COUNSEL]: It's calling for her to offer a medical opinion, which was not disclosed to us.

THE COURT: Your response?

[THE STATE]: They had all of her records, and her testimony today was that she wasn't sure of what that was because of this being the first time of seeing [Girlfriend]. So I think it's still within—it is not directly documented here because it's the absence of the matter. I still think it's within the, I guess, the spirit of the disclosure and what—what her medical experience is and what she saw versus—

THE COURT: The Court would be concerned about unfair surprise. I don't think that's the danger here, so I'll overrule the objection.

[THE STATE]: If I understand your testimony, is that if you have—don't have the advantage or opportunity of seeing a patient again afterwards, you may not be able to tell whether something is an injury or not?

24

[NURSE WARDLE]: It's hard to answer that with a yes or no, but yes, it's hard to tell.

[THE STATE]: *Okay. And so it's possible that this was bruising that's resolved?*

[NURSE WARDLE]: *Correct.*

[THE STATE]: *Is it fair to say it's also possible it's not bruising? I mean, it's— let me see. State's Exhibit 28, is it fair to say that that dark discoloration is not in [Girlfriend's] neck, on the left side of her neck in State's Exhibit 28?*

[NURSE WARDLE]: *Correct.*

[THE STATE]: *But it is present in State's Exhibit 21?*

[NURSE WARDLE]: *Correct.*

[THE STATE]: So it's resolved between the time that both of those photos were taken?

[NURSE WARDLE]: Yes.

[THE STATE]: *And you can't say with certainty what it is in State's Exhibit 21?*

[NURSE WARDLE]: *No.*

. . . .

[RE-DIRECT]

. . . .

[THE STATE]: And then my final questions are regarding African-American patients.

Do you have any medical experience treating African-American patients with darker skin tone?

[NURSE WARDLE]: Yes.

[THE STATE]: *Have you ever seen bruising to darker skin—I guess African-American patients who have a skin tone kind of darker, as [Girlfriend's]?*

[NURSE WARDLE]: *Yes.*

[THE STATE]: *And how does a bruise appear on someone with that skin tone?*

[DEFENSE COUNSEL]: *Objection. We were not given notice of this line of prospective testimony.*

[THE STATE]: Your Honor, the defense went into this on cross-examination, the fact that Ms. Wardle didn't document potential bruising to [Girlfriend's] neck on examination, so I think that they've opened the door to this line of redirect.

THE COURT: Again, the concern would be unfair surprise. I don't see the potential for that.

[DEFENSE COUNSEL]: Judge, there is unfair surprise here. It wasn't disclosed as any type of medical opinion or testimony that this witness would be giving.

25

THE COURT: I think it's asking about observations, not a medical opinion, at this point, as the question was phrased.

[THE STATE]: Your Honor, if I may address the, I guess, the constant attack on unfair surprise. I don't believe that the rules require the State to delineate each and every minute detail of a nurse or a doctor's medical training in the disclosure. I think asking about a bruise is not unfair surprise.

[DEFENSE COUNSEL]: Rule 16 certainly does if they're going to not be testifying as a treater but they're going to be offering general medical testimony or medical opinions. That puts them into the realm of an expert and that must be disclosed.

THE COURT: I'll overrule the objection. Would you restate the last question so the witness is focused?

[THE STATE]: I believe—I will do my best. *In your experience treating African-American patients with skin tone, darker skin tone, such as [Girlfriend's], how does a bruising [sic] appear on that skin tone?*

[NURSE WARDLE]: *It's not as evident, on paler skin. So sometimes you can have discoloration without bruising, but you—bruising tends to show up as dark discolorations.*

[THE STATE]: *And so is the way to figure out if it's just natural discoloration on a person's skin is to see them after the fact, to see if that, I guess, discoloration is still there or if it's resolved?*

[NURSE WARDLE]: *Yes, and—and other corroborating symptoms.*

[THE STATE]: And what do you mean by that?

[NURSE WARDLE]: So with a bruise, you'll have tenderness. You could possibly have swelling—

[THE STATE]: Okay.

[NURSE WARDLE]:—to go along with the bruising.

[THE STATE]: I understand. Thank you. I have no further questions.

(Emphasis and alterations added.)

We first conclude that during her direct examination, Nurse Wardle offered a comparison opinion of bruising on Girlfriend's neck based on her rational perception *and* specialized knowledge within the scope of Rule 702. Thus, the district court erred by implicitly admitting her opinion under Rule 701. Prior to the comparison, Nurse Wardle testified that at the time of Girlfriend's FACES exam, she did *not* have an opinion on whether "dark discolorations" on Girlfriend's neck were bruises because she "wasn't sure if that was the normal coloration of [Girlfriend's] skin." As revealed by Nurse Wardle's opinion testimony on re-direct, Nurse

26

Wardle's attempts to discern whether discoloration of an area is a bruise or natural coloring on African American skin tones, such as Girlfriend's, required her to apply her specialized training and expertise. Nurse Wardle indicated that she could not simply use every day reasoning from a base of common knowledge to opine whether the dark discoloration on Girlfriend's dark skin was a bruise. Instead, like the DRE expert's special mode of analysis in *Dacey*, Nurse Wardle had to consider the totality of the circumstances, i.e., whether the discoloration eventually disappeared as well as "other corroborating symptoms" (e.g., tenderness and swelling).

Nurse Wardle formed, on the stand, an opinion of the "dark discolorations" on Girlfriend's neck at the FACES exam. Nurse Wardle first compared the photo she took of Girlfriend's neck at the FACES exam with the recent photo of Girlfriend's neck that the prosecutor had taken just before trial. Then, Nurse Wardle applied the above mode of analysis and opined that the presence of "dark discolorations" on Girlfriend's neck in the photo from FACES, but absence of the same in the recent photo, *could* indicate that the discolorations were bruising. This opinion ultimately lacked probative value, but Nurse Wardle offered her opinion, nonetheless. Unlike her observational testimony regarding Girlfriend's presenting symptoms and complaints during the exam at FACES, Nurse Wardle offered *her* interpretation of the photos after applying her specialized knowledge. This type of opinion—which went beyond every day reasoning from common knowledge—was only admissible through a qualified expert under Rule 702.

We also conclude that, on re-direct, Nurse Wardle, provided another opinion based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Thus, the district court erred by implicitly admitting this opinion under Rule 701. As noted above, on re-direct, Nurse Wardle generalized that bruising is "not as evident" on African American patients with darker skin tones, such as Girlfriend's, unlike bruising on "paler skin." According to Nurse Wardle, African American skin tones can have dark discolorations that, based on rational perception, could be bruising *or* just natural coloring. Apparently, the only *reliable* way Nurse Wardle could discern the difference is by applying her specialized knowledge to interpret both (1) the condition of the skin after the passage of time; and (2) other corroborating symptoms.

In sum, the State elicited opinion testimony from Nurse Wardle that was only admissible through an expert under Rule 702. Thus, the district court erred in admitting her opinions under Rule 701.

### 3. The error in admitting Nurse Wardle's opinion testimony was harmless beyond a reasonable doubt.

Although Smith has established error, we conclude it is not reversible error. For the reasons below, we agree with the State's alternative argument that the error in admitting Nurse Wardle's opinion testimony was harmless beyond a reasonable doubt. To determine if an error is harmless beyond a reasonable doubt, we apply the test articulated in *Garcia*, 166 Idaho at 674, 462 P.3d at 1138.

When we exclude Nurse Wardle's opinion testimony, the probative force of the remaining record in establishing Smith's guilt of attempted strangulation significantly outweighs the probative force of the error in admitting Nurse Wardle's opinion testimony. In the second trial, Nurse Wardle, and other treatment providers, testified that Girlfriend had many signs, symptoms, and complaints apart from the issue of bruising. For example, Girlfriend presented with loss of consciousness, loss of bladder control, lightheadedness, breathing difficulties, pain or difficulty with swallowing, loss of memory, coughing, drooling, persistent throat pain, tenderness in her neck area, stiffness in her neck area, and a broken necklace. The State's strangulation expert, Dr. Binnion, testified that although there is no "one test" for attempted strangulation, such signs and symptoms are consistent with an attempted strangulation. Furthermore, Girlfriend herself testified to the above symptoms and complaints along with offering sworn testimony that Smith had strangled her in the apartment. Girlfriend also testified that a scratch seen on her neck in one of the exam photos was a spot where Smith "[took] off" a sore during the attempted strangulation.

Nevertheless, Smith maintains that probative force of the error in admitting Nurse Wardle's opinion testimony was strong enough to warrant reversal because it was the principal difference between the hung jury in the first trial and the unanimous jury in the second. Despite having similar evidence as the jury in the second trial, the jury in the first trial could not agree on whether Smith was guilty of attempted strangulation. Smith argues that according to the prosecutor's jury poll, the holdouts in the first trial did not convict because they "were not familiar with African American skin and how it may look injured versus not."

We disagree. As revealed by the record, the probative force of the error in admitting Nurse Wardle's opinion testimony was unimportant because it was not the only opinion that touched on this topic during the second trial. For example, the State's disclosed expert witness,

Dr. Binnion, testified to a substantively similar opinion as given by Nurse Wardle when it came to the appearance of bruising on darker skin tones. On the first day of the second trial, before Nurse Wardle testified, Dr. Binnion testified that the level of melanin in darker skin makes bruising appear differently and often requires a before and after comparison:

[THE STATE]: And have you heard the term petechiae?

[DR. BINNION]: Yes. Petechiae are little[,] teeny, tiny bruises. What happens is [] that when blood backups, for instance, if that vein gets compressed or there's really hard pressure like, for instance, you're coughing really hard or you're having a bowel movement really hard, you can be actually cause little blood vessels to burst. And that backup pressure causes these little teeny, tiny bruises and we call them petechiae. Sometimes they're even hard to tell the difference depending on, you know, your skin tone or your age, they can look like freckles.

[THE STATE]: So how are you able to discern if something is, for example, petechiae versus a freckle or, you know, whether what you suspect may be petechiae?

[DR. BINNION]: Well, if they're—if they're in the white part of the eye it's—people don't get freckles there, so it's pretty obvious to say that these are petechiae. If they're on the face and you don't know—like for me, you know, I have so many freckles you probably couldn't tell. The only way you would tell would be time. If they go away, they're petechiae. If they stay, they're freckles.

[THE STATE]: And have you treated anyone or had the occasion to look for petechiae on a person with darker skin color?

[DR. BINNION]: *Yeah. Just last year we had a gal that was from the Middle East and kind of had, you know, darker skin. And it's—sometimes bruises are harder to see because of that—the bluing gets hidden behind the melanin in the skin.*

(Emphasis and alterations added.)

In addition, Nurse Hordemann, a nurse from the emergency department, testified, with no objection from Smith, that the appearance of "red marks" on an African American individual with fairly dark skin, such as Girlfriend's, would appear differently than the same on "white strangulation patients[.]" Admittedly, red marks are different symptoms than bruises as it relates to strangulation. Nevertheless, the substance of this distinction is immaterial here because the underlying theme of Nurse Hordemann's and Nurse Wardle's opinions are the same: the amount of melanin in one's skin changes the way injuries will appear or not appear.

In summary, based on all the evidence the second jury heard, the probative force of the error in admitting Nurse Wardle's opinion was unimportant and does not outweigh the probative

force of the record in establishing Smith's guilt without the error. Accordingly, the error was harmless beyond a reasonable doubt.

**F. The district court's order of restitution for Girlfriend's lost wages is supported by substantial evidence in the record.**

Smith next argues that of the $5,846.12 in total restitution ordered by the district court, the $363 in restitution for Girlfriend's lost wages was not supported by substantial evidence. Smith asks us to vacate this portion of the order because Girlfriend's actual work schedule, for the days she is being compensated, was not admitted and is necessary to support the order. We disagree.

The standard of review in an appeal from a district court's order of restitution is abuse of discretion. *Garcia*, 166 Idaho at 681, 462 P.3d at 1145. On appeal, a trial court's factual findings will not be disturbed if they are supported by substantial evidence. *State v. Wisdom*, 161 Idaho 916, 924, 393 P.3d 576, 584 (2017). "Substantial evidence is 'relevant evidence as a reasonable mind might accept to support a conclusion.' " *Id*. at 919, 393 P.3d at 579 (quoting *State v. Straub*, 153 Idaho 882, 885, 292 P.3d 273, 276 (2013)).

In Idaho, a "crime victim," as defined by statute, has the right "[t]o restitution, as provided by law, from the person committing the offense that caused the victim's loss." Idaho Const. art. I, § 22; *see also State v. Foeller*, 168 Idaho 884, 888, 489 P.3d 795, 799 (2021). "[W]hether to order restitution . . . is within the district court's discretion and is guided by consideration of the factors set forth in Idaho Code section 19-5304(7)." *Wisdom*, 161 Idaho at 919, 393 P.3d at 579 (alteration original).

Idaho Code section 19-5304(7) provides in full:

> The court, in determining whether to order restitution and the amount of such restitution, shall consider the amount of economic loss sustained by the victim as a result of the offense, the financial resources, needs and earning ability of the defendant, and such other factors as the court deems appropriate. The immediate inability to pay restitution by a defendant shall not be, in and of itself, a reason to not order restitution.

I.C. § 19-5304(7).

"[U]nless the court determines that an order of restitution would be inappropriate or undesirable . . . . [r]estitution shall be ordered for any economic loss which the victim actually suffers." I.C. § 19-5304(2). The district court is required to base its restitution order on

the "preponderance of the evidence" submitted by the prosecutor, defendant, victim, or presentence investigator. I.C. § 19-5304(6); *Wisdom*, 161 Idaho at 919, 393 P.3d at 579.

In this case, Girlfriend testified to the following at the restitution hearing: she had been working at the Restaurant for three months leading up to the underlying incident; she claimed lost wages for eight days (the time it took to be medically cleared to return to work); she typically worked anywhere from 25 to 40 hours per week; she was consistently scheduled to work each week; and that she was scheduled to work during the week she was claiming lost wages but could not recall the exact number of hours she was scheduled. Next, a financial recovery officer for the Crime Victims Compensation Program testified that she collected the following information from the Restaurant: Girlfriend's rate of pay was $11 per hour; she averaged 33 hours per week; she was scheduled to work during the eight days she claimed; and that the Restaurant did not have a copy of the actual schedule for those eight days.

On appeal, Smith argues that without the actual schedule for the eight days Girlfriend claims, there is not sufficient proof that Girlfriend was in fact scheduled to work. However, Smith's argument is meritless. The district court made an ultimate finding of fact, based on the preponderance of the evidence, that Girlfriend suffered an economic loss because she was scheduled to work during the eight-days she claimed lost wages. The evidence recited above is sufficient to support this finding. Contrary to Smith's argument, and although it would have been helpful, the district court was not required to have the actual work schedule from the Restaurant to make this finding. Therefore, the district court's order of restitution for Girlfriend's lost wages is supported by substantial evidence and we affirm the order of restitution in full.

### III. CONCLUSION

The judgments of the district court, and its order of restitution, are affirmed.

Chief Justice BEVAN, and Justices STEGNER, MOELLER, and ZAHN, CONCUR.