## IN THE COURT OF APPEALS OF THE STATE OF IDAHO

### Docket No. 49301

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) **Filed: July 20, 2023** |
| Plaintiff-Respondent, | ) |
| | ) **Melanie Gagnepain, Clerk** |
| v. | ) |
| | ) **THIS IS AN UNPUBLISHED** |
| TERRY GLEN ULLOM, | ) **OPINION AND SHALL NOT** |
| | ) **BE CITED AS AUTHORITY** |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the First Judicial District, State of Idaho, Shoshone County. Hon. Barbara Duggan, District Judge.

Judgment of conviction for attempted strangulation and domestic battery, <u>affirmed</u>.

Silvey Law Office, Ltd.; Greg S. Silvey, Boise, for appellant.

Hon. Raúl R. Labrador, Attorney General; Mark W. Olson, Deputy Attorney General, Boise, for respondent.

---

HUSKEY, Judge

Terry Glen Ullom appeals from the judgment of conviction for attempted strangulation. On appeal, he argues the district court erred when it admitted irrelevant testimony regarding the general characteristics of domestic violence relationships and when it excluded his expert testimony regarding the victim's state of mind at the time of the event. Because the testimony regarding the nature of domestic violence relationships was relevant, the district court did not err in admitting the evidence. Similarly, the district court did not err in excluding Ullom's expert testimony regarding the victim's state of mind at the time of the event because defense counsel acknowledged he was not going to be admitting that testimony and because the testimony was beyond the scope of the expert's knowledge and experience. The judgment of conviction is affirmed.

1

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

Ullom lived with his long-time girlfriend, Marla Hartman. One evening, after socializing with friends at a local bar, Ullom wanted to continue socializing and invited the friends back to the house. Later, Hartman rescinded Ullom's invitation. This angered Ullom and on the way home there was a physical altercation between Ullom and Hartman. Hartman claimed Ullom battered and attempted to strangle her. She escaped, ran into their shared home, and locked the door. Believing that Ullom would continue to assault her and ultimately kill her, Hartman retrieved a handgun and fired a warning shot through a window. She looked out and saw Ullom laying on the porch but she did not see any blood. Believing Ullom would kill her, Hartman shot Ullom, causing a head injury. She then accidentally discharged the gun into a closet and called 9-1-1.

Emergency medical services and law enforcement were dispatched to the home. Ullom, who was severely injured, was taken to the hospital. Hartman was taken to the hospital early the next morning where she was diagnosed with a bruised rib, a fractured rib, contusions to her head and arms. Ullom also had numerous other bruises and marks on her neck. Hartman sought follow-up treatment for her continued head pain.

Ullom was charged with felony attempted strangulation, Idaho Code § 18-923, and misdemeanor domestic battery, I.C. §§ 18-903, 18-918(3)(b). Prior to trial, the State filed an Idaho Rule of Evidence 404(b) motion to admit certain evidence detailing the relationship between Ullom and Hartman. The State also filed an expert witness disclosure for Sherri Cameron, also known as Sherri Coronado, listing ten proposed areas of testimony. Lastly, the State filed a motion in limine to preclude Ullom's firearm expert, Gaylen Warren, from testifying about Hartman's state of mind at the time she shot Ullom. During the motion in limine hearing, the State made the same objection to Ted Pulver, the defense investigator, testifying that, in his professional opinion, Hartman's "supposed argument [regarding the physical altercation and her fear of Ullom] is a fabrication and justification for a murder attempt."

Following the hearing on the motions in limine, the district court concluded Cameron would be permitted to testify on the general dynamics of domestic violence relationships but not on the other areas requested by the State. The district court also held that neither of the defense experts could testify about Hartman's state of mind at the time of the shooting. Ullom was

2

convicted of both charges following a jury trial and appeals only from his conviction of attempted strangulation.

## II.

## STANDARD OF REVIEW

"The question of whether evidence is relevant is reviewed de novo, while the decision to admit relevant evidence is reviewed for an abuse of discretion." *State v. Smith*, 170 Idaho 800, 807-08, 516 P.3d 1071, 1078-79 (2022) (quoting *State v. Shutz*, 143 Idaho 200, 202, 141 P.3d 1069, 1071 (2006)). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine whether the lower court: (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion; (3) acted consistently with any legal standards applicable to the specific choices before it; and (4) reached its decision by an exercise of reason. *State v. Herrera*, 164 Idaho 261, 270, 429 P.3d 149, 158 (2018).

## III.

## ANALYSIS

### A.     Relevancy of Domestic Violence Testimony

Ullom's first argument on appeal is that the district court erred in admitting the testimony of Cameron, who was permitted to testify about the "dynamics of a relationship that relies on domestic violence," generally, but not about Ullom and Hartman's relationship, specifically. Ullom argues this evidence was irrelevant because the district court previously ruled that testimony about prior instances of domestic battery by Ullom upon Hartman was propensity evidence and inadmissible pursuant to I.R.E. 404(b). Ullom argues that without any evidence of prior domestic abuse, general information about domestic violence would not assist the jury in answering the question at issue--whether, in this case, Ullom attempted to strangle Hartman. Ullom further argues that testimony about generally abusive relationships would lead the jury to speculate about whether Ullom had previously battered Hartman and that such speculation would lead to suspicion, which would result in the jury relying on propensity evidence to find Ullom guilty. Ullom also asserts the erroneous admission was not harmless because the testimony essentially vouched for Hartman's credibility in a case where the victim's credibility was critical.

The State argues the evidence was relevant because the testimony addressed the defense's theory of the case that "Hartman lied about Ullom's actions and about her fear of him in order to

3

attempt to obtain exoneration for an intentional attempted murder." The State argues the evidence was also relevant to evaluate challenges to Hartman's credibility, "evaluations regarding her behavior after the charged conduct, purported inconsistent testimony and forgotten events, that Hartman never left the relationship with Ullom, [and] that she did not display petechiae."

Evidence that is relevant to a material and disputed issue concerning the crime charged is generally admissible. *State v. Stevens*, 146 Idaho 139, 143, 191 P.3d 217, 221 (2008). Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. I.R.E. 401; *Stevens*, 146 Idaho at 143, 191 P.3d at 221. Whether a fact is of consequence or material is determined by its relationship to the legal theories presented by the parties. *State v. Johnson*, 148 Idaho 664, 671, 227 P.3d 918, 925 (2010). Pursuant to I.R.E. 702, an expert witness may provide an opinion "if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."

### 1.    Cameron's Testimony Regarding the Dynamics of Domestic Violence

As context for the parties' arguments, additional factual background is necessary. Ullom had an outstanding Colorado felony arrest warrant issued in approximately 2002 for a charge of transporting marijuana. Because Ullom was a fugitive from justice on that warrant, to evade arrest, he used a fake name and Hartman was the sole individual listed on Ullom and Hartman's shared home, all bank accounts, and all of Ullom's business accounts related to his successful blacksmith work.

Ullom explained his theory of defense to the district court and stated that he expected the evidence at trial to show that all power and control in the relationship rested with Hartman because of Ullom's fugitive status. According to Ullom, because Hartman knew Ullom was a fugitive, Hartman also knew that if she contacted law enforcement about anything, Ullom would have been arrested and extradited to Colorado. As a result, Hartman was not a victim of domestic abuse and did not suffer from battered woman syndrome because she maintained all the power in the relationship. Instead, according to Ullom, it was he who lived in constant fear and was submissive to Hartman so that she would not contact law enforcement. As a result, argued Ullom, Cameron's testimony was not relevant to the facts of the case because there was no evidence or a basis to suggest Hartman had been victimized in the past by Ullom and Hartman's circumstances were unlike the people Cameron would characterize as victims of domestic violence. In sum, Ullom

4

argued, "There's just a total lack of evidence that [Hartman] has ever been a victim of domestic violence at the hand of Mr. Ullom."

The State proffered that Cameron would testify generally about the characteristics of domestic violence and some of the circumstances under which domestic violence occurs. The State argued that in light of Ullom's theory of defense, the testimony was relevant to explain the dynamics of domestic violence relationships and why Hartman might not have reported prior instances of domestic violence. The State further asserted that understanding why victims of domestic violence do not do certain things that society thinks a normal person would do was beyond the knowledge and understanding of the typical juror and, thus, appropriate for expert testimony.

The district court cited the relevant evidentiary rules and concluded the evidence was relevant, the dynamics of a domestic violence relationship is not within the normal experience of a juror, and Idaho precedent permitted the testimony so long as there was no opinion of whether the person was or was not a victim of domestic abuse. The court tentatively granted the motion to allow Cameron's testimony on the nature and dynamics of a domestic violence relationship.

Ullom identifies the following areas of Cameron's testimony as irrelevant: (1) all testimony regarding general dynamics of domestic violence; (2) how trauma affects recall; and (3) statements about concussions. Ullom's opening statement at trial painted Hartman as the person who had full control of the relationship. Counsel emphasized how Hartman controlled all the money in the relationship, including everything related to Ullom's businesses. Ullom's opening statement also suggested that Hartman had put in motion a series of events, like moving the physical location of the business closer to their home so that all physical and financial assets of the business would be closer to Hartman, and she would retain sole control of the business if something happened to Ullom. Counsel also suggested that Hartman received her injuries either from helping move the physical business assets or falling down the embankment in front of the house the night of the incident. Ultimately, Ullom's counsel stated that Hartman had used Ullom to make money for the business that was in her name and intimated that when Hartman learned Ullom was tired of her, she fabricated a scenario in which she could retain all the business and personal assets and claim self-defense after she shot Ullom. After the State finished its direct examination of Hartman, Ullom continued with his theme during his cross-examination of Hartman:

Counsel:   You had had power and control over Terry Ullom for 18 years, isn't that correct?

Hartman:   No.  He had power over me.

Counsel:   Did he have the finances?

Hartman:   No.

Counsel:   Did he have the bank accounts?

Hartman:   No, because he couldn't.

Counsel:   Did he have property in his name?

Hartman:   Nope.  I protected him.

Counsel:   And that gave you power over him, didn't it?

Hartman:   I didn't think so.

Counsel:   He paid for your protection with the labor that he gave you every day of those 18 years; isn't that correct?

Hartman:   I worked pretty hard and I felt like I was a slave.  I did what he wanted me to do because he would get very angry and very scary sometimes.

Counsel:   And it was good until it wasn't?

Hartman:   Sometimes it was like that, you know.  There were moments where life could be good, you know.  I made the best of what I could.  I tried to make it work and I was also afraid of him.

Counsel:   And when he told you the relationship was over and it was done--

Hartman:   He never said that.

Counsel:   --you shot him?
           At that point, it wasn't good, was it?

Hartman:   He never said that to me, so . . .

Counsel:   Your testimony on direct was he had said some bad things to you that night; is that correct?

Hartman:   Yeah.  He said some nice swear words to me.

Counsel:   And one of the things that he said was that he was going to replace you with a couple of thirty-year-olds; right?

State:     I'm going to object.  Questioning facts that are not in evidence, Your Honor.

Court:     Overruled.

Counsel:   Is it true that that's one of the statements that he made to you?

Hartman:   No.

Counsel:   And you thought those women that were there were some kind of a threat to you?

Hartman:   No.  I didn't feel like they were a threat to me at all.
           . . . .

Counsel:   So your testimony is that you remained in this relationship out of fear?

Hartman:   Part-wise, yeah.  I didn't know how to get out of it without it being dangerous to me--

Counsel:   All you had to do--

Hartman:   --I did what I could.

Counsel:   All you had to do was pick up the phone and tell the police there was a wanted man living at this address; is that correct?

Hartman:   I wish it were that simple but it's not.

6

The State's next witness was Cameron, who testified that she did not know Ullom or Hartman, did not know any of the specific facts relating to the case, and was not providing an opinion on the specific facts of the case. Instead Cameron testified about generally about "the general tactics in domestic violence, to discuss the cycle of violence, the power and control that happens, common reasons that a victim may be reluctant to report, reasons that we understand through education and training as to why a victim may recant, not show up for the court" and other "generalization across the board for domestic violence." She further explained that all of those categories may or may not pertain to the case. Cameron defined domestic violence as a relationship about power and control; that the power belongs to the predominant aggressor in the relationship; and that power does not shift. She explained that the predominant aggressor uses tactics to keep the victim in the relationship, including threats of physical and financial harm, as well as emotional manipulation. She testified that victims may fail to report the abuse because of the love and ongoing feelings the victim has for the aggressor, fear of past threats, religious or cultural values, and children in common.

Ullom also testified. In his testimony, Ullom painted Hartman as the abusive partner in the relationship and he stated he relied on her for pocket money, driving him around, and managing the business. He further testified that Hartman shot him after he told her he wanted to end the relationship.

Cameron's testimony regarding the nature and dynamics of a domestic violence relationship was relevant in light of the testimony elicited from Hartman and Ullom. Ullom's theory of defense was to present Hartman as the party in the relationship with all the control and power; that she stayed in the relationship because of the financial benefits that accrued to her, not because she was afraid of Ullom; and that Hartman's story was concocted as a way of providing a justification for shooting Ullom. The State's theory was that Hartman relied on Ullom financially and she was not the aggressor in the relationship. Expert testimony explaining the dynamics of an abusive relationship would help the jury assess the credibility of Hartman and Ullom and help the jury understand why each behaved the way they did. For example, Ullom's testimony questioned Hartman's reason for staying in the relationship; thus, Cameron's testimony explained why that might be the case. Ullom similarly challenged Hartman's statement that she was afraid of Ullom that night; Cameron's testimony could help the jury assess the credibility of both Hartman and Ullom as they testified to their version of events and why they occurred. Cameron similarly

7

explained why an individual might stay in a relationship, despite physical violence, which would explain why Hartman might not have reported alleged prior abuse. Ullom further used Cameron's testimony to support his theory of defense, asking Cameron if men could be victims (yes), whether financial control could be a method to control a victim (yes), and whether the victim's need to maintain anonymity was a way to control the victim (possibly). As such, Cameron's testimony was relevant to rebut and support both Hartman's and Ullom's testimony and help the jury assess credibility. Consequently, the district court did not err in concluding the evidence was relevant.

### 2. Testimony Regarding How Trauma Affects Recall

Although Ullom challenges a specific question in Cameron's trial testimony about how trauma affects recall, Ullom did not register any relevance objection to this testimony, either at the pretrial hearing or at the trial. Cameron testified to several statements that trauma affects recall but the only question to which Ullom objected was the following:

> State:      So based upon your training and experience, it's not uncommon that there may be pieces of memory or pieces of a story--
> Counsel:   Objection, your Honor. Leading.
> Court:      Please let the prosecutor finish her question before interposing your objection.
> State:      So based upon your training and experience, are there situations that you have experienced in which pieces of that memory never comes back?
> Cameron:   Yes.

Ullom did not object either to the rephrased, complete question, or the answer, and his only evidentiary objection was a discrete objection to the leading nature of an incomplete question.

In *State v. Cuenca*, 171 Idaho 603, 524 P.3d 882 (2023), the Idaho Supreme Court reiterated the long-standing rule that:

> "A party must raise both the issue and their position on that issue before the trial court for this Court to review it." [*Siercke v. Siercke*, 167 Idaho 709, 715, 476 P.3d 376, 382 (2020)]. When raising the issue, "either the specific ground for the objection must be clearly stated, or the basis of the objection must be apparent from the context." *Lingnaw v. Lumpkin*, 167 Idaho 600, 609, 474 P.3d 274, 283 (2020) (quoting *Hansen v. Roberts*, 154 Idaho 469, 476, 299 P.3d 781, 788 (2013)).

*Cuenca*, 171 Idaho at 606, 524 P.3d at 885. Similarly problematic for Ullom is this Court's holding in *State v. Chacon*, 168 Idaho 524, 532, 484 P.3d 208, 216 (Ct. App. 2021), where we noted, "Idaho's appellate courts [have] also routinely held that an objection on one ground would not preserve for appeal an objection on another ground." On appeal, Ullom does not object to the question as leading, but rather, challenges the admission of all of Cameron's unobjected to

testimony regarding trauma and recall on relevance grounds. At trial, Ullom objected to the question as leading. Objecting to a question as leading does not preserve a challenge to the relevance of the evidence and, as a result, Ullom has failed to preserve any claim regarding the relevancy of the evidence for appeal and, thus, we decline to address his argument in this regard. This Court declines to address for the first time on appeal, a claim that the district court erred in admitting irrelevant testimony. Consequently, we decline to address Ullom's claim that the district court erred on this evidentiary ruling.

### 3. Testimony Regarding Concussion

When cross-examining Cameron, Ullom asked Cameron about why physical evidence of injuries may or may not be present on a victim and whether the presence or absence of physical evidence "doesn't mean anything." Cameron responded that physical evidence "does mean something." When asked to clarify, Cameron noted that when someone is picked up by the neck, as Ullom's counsel described, the victim could have other injuries, "specifically, a concussion." Ullom did not move to strike any portion of Cameron's answer.

On redirect, the State followed up on the concussion testimony:

State: And you mentioned concussions that can occur. Can you describe for me, based upon your training and experience, what that looks like after an attempted strangulation?
Counsel: Your Honor, I'm going to object. I think that calls for a medical conclusion.
Court: Overruled.

Ullom did not make a relevance objection to this testimony at trial. Instead, his objection was, essentially, that the testimony was outside Cameron's area of expertise. As discussed above, failing to object on relevance grounds at trial fails to preserve a relevance challenge on appeal. *Chacon*, 168 Idaho 524, 532, 484 P.3d 208, 216. Finally, failing to provide argument and authority on appeal that the district court incorrectly overruled Ullom's challenge as outside the scope of Cameron's expertise waives any challenge to the ruling actually made by the trial court. *State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996). As a result, we decline to address the argument raised by Ullom on this issue.

### B. The District Court Did Not Err in Limiting Ullom's Experts' Testimony About Hartman's State of Mind

Ullom provided notice of two experts, Gaylan Warren and Ted Pulver. Warren was a firearms expert who provided a report on and was proffered to testify about the handgun Hartman

used to shoot Ullom. In his expert report, Warren provided information on how the weapon worked; the sequence of events as alleged by Hartman and taken from a police report; that "there is no indication of imminent danger of death or serious bodily injury indicated in any of the statements alleged by [Hartman]"; and that "a self[-]defense scenario requires eminent [sic] danger. Given the time to retrieve and manipulate this gun and the opportunity to flee, there is no eminent [sic] danger indicated."

Pulver was an investigator hired on behalf of Ullom. In the disclosure, Ullom proffered that Pulver would be used to refute or rebut Hartman's testimony based on Pulver's interviews of other people and his observations. Pulver's report indicated that he interviewed several witnesses, provided his opinion that Hartman's version of events was untruthful, and that in his professional opinion, Hartman's "supposed argument [regarding the physical altercation and her fear of Ullom] is a fabrication and justification for a murder attempt."

The State filed a motion in limine to preclude Warren from opining on Hartman's subjective state of mind at the time of the incident. At the hearing on the motion, the State raised a similar objection to Pulver's testimony, who had been disclosed after the State filed its motion and only four days before the hearing. Ullom's counsel stated, "Gaylan Warren is not going to testify about the victim's state of mind or that she could not have been afraid. He will provide factual evidence about that particular weapon." Counsel further clarified that Warren would testify about measurements indicating how far Hartman was from Ullom, and "the amount of force that's needed, first, in the trigger pull of that weapon, and additionally the amount of force that it takes to open the weapon to allow you to put that cartridge back into the weapon." Counsel further summarized:

> So I think (inaudible) Mr. Warren, Mr. Pulver, they're not going to be making-- contrary to what the Government suggested, they're not going to be making conclusions here. They'll just provide the factual background, including measurements and information about the weapon and that sort of thing that the jury, we're hopeful, will use as evidence that they will use in their ultimate--their ultimate decision about what occurred on that particular night.

The court ruled that Warren was qualified to provide expert testimony about the weapon, how it worked and how it operated; however, Warren was not qualified to give any other opinions regarding the facts and circumstances on the night of the shooting or provide any opinions of either of the parties' state of mind because he did not have any personal knowledge necessary to provide such an opinion and because it was outside the type of expert opinion permitted in a trial. The

10

district court similarly ruled that Pulver could testify about his investigation but could not provide facts or any opinions beyond the facts and circumstances of his investigation because to do so would invade the province of the jury. During trial, both Warren and Pulver testified regarding their investigations and were never asked about or offered testimony about Hartman's state of mind.

On appeal, Ullom argues the district court erred by precluding Warren's testimony regarding Hartman's state of mind and Pulver's testimony regarding his opinion that Hartman's story was fabricated to justify the shooting because the testimony was relevant to Hartman's "bias and therefore her credibility." The State argues the district court did not err because neither expert possessed the requisite knowledge to provide opinions on Hartman's state of mind or the credibility of her story.

At neither the motion in limine hearing nor at trial did Ullom argue the experts' testimony regarding Hartman's state of mind was relevant to her bias and credibility. Failing to argue relevance as to Hartman's bias and credibility at the trial court means that argument is not preserved for appellate review. *Cuenca*, 171 Idaho at 606, 524 P.3d at 885 (reiterating that "a party must raise both the issue and their position on that issue before the trial court for this Court to review it").

And this is not a case of simply failing to raise an issue. Instead, trial counsel explicitly indicated he would *not* be eliciting the testimony he now challenges on appeal. Thus, any error in precluding the admission of Warren's and Pulver's testimony on the subjective state of Hartman's mind is invited error. The doctrine of invited error applies to estop a party from asserting an error when that party's conduct induces the commission of the alleged error. *State v. Atkinson*, 124 Idaho 816, 819, 864 P.2d 654, 657 (Ct. App. 1993). The purpose is to prevent a party who caused or played an important role in prompting the trial court to take action from later challenging that decision on appeal. *State v. Barr*, 166 Idaho 783, 786, 463 P.3d 1286, 1289 (2020). In short, invited errors are not reversible. *State v. Gittins*, 129 Idaho 54, 58, 921 P.2d 754, 758 (Ct. App. 1996). Because Ullom specifically told the district court he would not be eliciting the testimony, he cannot now complain the district court ruled in accordance with his evidence proffer.

Ullom cites to *State v. Oxford*, 167 Idaho 515, 473 P.3d 784 (2020), in support of his argument. In that case, Oxford was charged with burglary and second degree kidnapping for kidnapping her neighbor's infant. *Id*. at 518, 473 P.3d at 787. Approximately seven weeks after

11

Oxford was arrested, she was ordered to undergo a competency examination. *Id.* At trial, the defense sought to introduce the testimony of the doctor who conducted the competency evaluation to opine on Oxford's state of mind at the time of the crime and whether, in light of her mental illness, she could form the specific intent required for the crime. *Id.* at 519, 473 P.3d at 788. The State filed a motion in limine, objecting to the evidence on the grounds that Oxford's state of mind seven weeks after the crime was irrelevant to establish her state of mind at the time of the crime. *Id.* At the hearing, defense counsel explicitly indicated he was not calling the expert to give an opinion on whether Oxford had the specific intent to commit the crime, but instead, to testify about the expert's interview with Oxford during the competency evaluation and the results of the evaluation. *Id.* at 523, 473 P.3d at 792. The district court ruled that prior to admitting the evidence at trial, Oxford would need to lay proper foundation for the testimony. *Id.* At trial, defense counsel sought to introduce evidence of the doctor's competency evaluation, his observations, and his diagnosis. *Id.* The district court ruled this was insufficient foundation for the doctor to testify about Oxford's mental health conditions or the specific intent requirements of the crime. *Id.*

The Idaho Supreme Court affirmed the district court and held the district court did not abuse its discretion in holding that Oxford failed to lay a sufficient foundation about Oxford's mens rea at the time of the crime and that the evidence about her subsequent competency evaluation was not relevant. *Id.* at 522, 473 P.3d at 791. The Court held that the testimony regarding the competency evaluation would not have assisted the trier of fact in determining Oxford's state of mind at the time of the crime and that it is "incumbent upon the defense to call a qualified expert witness to 'connect the dots' for the jury by offering a competent medical opinion, rather than merely laying out the data and permitting the jury to reach their own conclusions." *Id.* at 524, 473 P.3d at 793.

To the extent the holding in *Oxford* is applicable in this case, it only stands for the proposition that the proponent of the expert testimony must provide an adequate foundation for the expert to provide his opinion. As noted above, a prerequisite to admitting expert testimony pursuant to I.R.E. 702 is that an expert has "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." In this case, Ullom has offered no competent expert witness to provide testimony regarding Hartman's state of mind and for the experts he disclosed, he could not lay sufficient foundation for them to testify about Hartman's state of mind at the time of the shooting. Nothing in Warren's or Pulver's

12

expert disclosures or their respective testimony provided the requisite foundational knowledge for them to provide the challenged opinions. Warren testified as a firearms expert, detailed his experience in working with firearms, and explained how to load and unload the handgun that was used by Hartman. Warren also described his examination of the scene where the altercation occurred, his attempt to do a shooting scene reconstruction, and his opinion that the officers did not adequately preserve the scene. Noticeably absent from his resume or his testimony is any experience assessing, identifying, reconstructing, or explaining an individual's state of mind, generally, or Hartman's state of mind, specifically. The lack of educational or professional experience, combined with the lack of any personal knowledge about Hartman's state of mind on the night of the altercation, precluded Warren from providing any testimony about Hartman's state of mind. He simply did not qualify as an expert on this topic and, therefore, could not provide any testimony on this topic.

For the same reason that Warren was not qualified to testify as to Hartman's state of mind, Pulver was similarly unqualified to opine about what he perceived Hartman's motivations were at the time of the shooting; any such testimony simply falls outside his area of expertise. However, Pulver could, and did, testify about his investigation and what that investigation revealed; his criticism of the investigation by local law enforcement; and his conclusion that law enforcement prematurely concluded what happened in the case. He further testified that "sometimes the reporting party is not the good guy"; the home contained other means of escape besides the front door; Hartman gave "so many different contradictory statements" that she could not be fully interviewed at the scene; Hartman displayed no injuries that were consistent with her version of events in her videotaped interview with law enforcement; and he saw evidence that indicated the shooting was premeditated. After eliciting the above statements, Ullom then asked Pulver: "And what was the evidence that you saw that indicated perhaps premeditation?" After Pulver answered, the State objected both as to foundation and to an assumption of facts that had not yet been introduced; the district court sustained the objection.[1]

---

[1] On appeal, Ullom does not challenge the district court's basis for sustaining the objection, which was lack of foundation and assuming facts not in evidence. As discussed above, the failure to challenge the basis of the actual ruling precludes this Court's review of the issue. *State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996).

Any error to the district court's ruling regarding Warren's and Pulver's testimony on Hartman's state of mind was not preserved because Ullom did not raise the issue in the trial court and was invited by Ullom's representation that he would not be presenting the evidence. Finally, the expert disclosures did not detail sufficient educational or experiential foundation for the experts to opine on Hartman's state of mind and, thus, are outside the scope of their respective expertise. Given our holding on those grounds, we decline to address the remainder of Ullom's arguments on this issue.

## IV.
## CONCLUSION

The district court did not err in its evidentiary rulings in this case. We affirm Ullom's judgment of conviction.

Chief Judge LORELLO and Judge GRATTON **CONCUR**.